HELEN SMUZYNSKI, RESPONDENT, v. EAST ST. LOUIS RAILWAY COMPANY, APPELLANT.—93 S. W. (2d) 1058.

St. Louis Court of Appeals. Opinion filed May 5, 1936.

*Lashly, Lashly & Miller* for appellant.

*Louis E. Miller* and *Wm. C. McLaughlin* for respondent.

HOSTETTER, P. J.—This suit was begun on the 19th day of February, 1932, in the Circuit Court of the City of St. Louis, Missouri. The petition seeks a recovery from the defendant railway company growing out of an accident on the night of January 11, 1931, whereby plaintiff was injured by being struck by an automobile in the 4100 block on Bond Avenue, after leaving defendant's street car on which she had been a passenger. The place of accident was a short distance east of the corporate limits of East St. Louis, Illinois. Bond Avenue runs east and west and the street car from which plaintiff alighted was going eastwardly on Bond Avenue which is about forty feet wide from curb to curb. The width of the concrete slab on each side was about ten feet, and the cinder or dirt portion in the center of the street was about twenty feet wide. The street car track in the middle of the cinder portion was about five feet wide. Both concrete slabs were very much used by vehicular traffic. The plaintiff lived at 4137 Bond Avenue on the north side of the street, which was at about the middle of the block. The automobile which struck and injured plaintiff was westward bound, and, consequently, was being driven on the ten foot concrete slab on the north side of Bond Avenue.

The amended petition, being the one on which the case was tried, after setting out the incorporation of the defendant and its ownership, control and operation of the street car and street railway referred to, set out in substance the following as to the manner in which the injuries were received and the negligence imputed to defendant. (We omit a description of the injuries.)

It was averred that on or about the 11th day of January, 1931, plaintiff was a passenger lawfully in and upon a certain Alta Sita street car which was being operated eastwardly on Bond Avenue in the city of East St. Louis, Illinois; that at said time and place the night was exceedingly dark and a great and heavy rain was falling and that as said street car approached the intersection of Forty-

Second Street with Bond Avenue plaintiff signaled to the motorman in charge of said street car her intention to alight from same at the place customarily provided for passengers at Forty-Second Street and Bond Avenue; that after giving the signal aforesaid the street car was brought to a stop near the middle of the 4100 block of Bond Avenue, not at a place usually provided for the discharge of passengers; that plaintiff, believing the street car to have been brought to a stop at Forty-Second and Bond Avenue and at a place customarily provided for the discharge of passengers, thereupon, in obedience to the orders and directions of the motorman, alighted from the left front door of the street car upon said Bond Avenue and into the path of a certain west bound automobile, and, as a direct and proximate result of the negligence and carelessness of defendant as hereinafter set out, was caused to be struck by said automobile and sustained injuries.

The following specific charges of negligence were made, under four divisions, which, grouped together, are as follows: That the motorman negligently caused and directed plaintiff to alight in the nighttime on a portion of Bond Avenue much traveled by vehicles and at a place where plaintiff would likely be struck and injured by passing vehicles and that said motorman knew, or by the exercise of the highest degree of care could and should have known that said place in which the plaintiff was directed to alight was likely to cause her to be struck and injured as aforesaid; that said motorman failed and omitted to warn plaintiff of the dangers attending a passenger in attempting to alight from the said street car under the circumstances then and there existing, and that said motorman carelessly and negligently directed and caused plaintiff to alight in the nighttime at a place not customarily provided for the discharge of passengers and at a place much frequented by vehicular traffic, which was unknown to the plaintiff, and at such a place that the said motorman knew, or should have known, plaintiff was likely to be struck and injured.

The petition in detail described the injuries alleged to have been received and asked for $10,000 damages.

The answer consisted of a general denial and a plea of contributory negligence on the part of plaintiff.

Plaintiff testified as follows: That she lived at 4137 Bond Avenue, East St. Louis; that she was thirty-eight years old, married, and had two children; that on the 11th day of January, 1931, she was riding as a passenger in an Alta Sita car of the defendant company, having boarded that car some distance west where she had been visiting a friend; that Josephine Golsch, who also lived at 4137 Bond Avenue, was on the street car with her and alighted at the same time; that when the car got into the 4100 block they rang the bell to get off and then went up to the front of the car to the right side and the motor-

man said: "This way out," and opened the left front door; that ordinarily they got out on the right side; that at that time it was dark and rainy and about 9:30 in the evening; that she started out of the car ahead of Josephine Golsch and stepped out and was just hit and knocked out; that she learned later what hit her; that the street car stopped in the middle of the block or thereabouts; that the motorman didn't warn her to be careful of machines passing close to the car; that there were only three passengers on the car at the time, herself, Josephine Golsch, and a colored man; that the car only went one block farther to the end of the run; that she was taken from the place where she was struck to the hospital.

On cross-examination she gave the following testimony: That she had lived at 4137 Bond Avenue for five or six years; that her house is on the north side of the street about the middle of the 4100 block; that Bond Avenue is a residential street forty or fifty feet wide, but she could not be exact; that it had a concrete slab on either side; that the car on which she was riding would go to the end of Bond, which is in the 4200 block, and switch the trolley and proceed back on the same track; that the only way they had of getting to their residence on Bond Avenue was by this Alta Sita car and that she used it frequently; that the car had doors on either side at both ends so that when the trolley was moved from one end of the street car to the other when the car got out to 4200 Bond Avenue, entrance could be had from the other side; that the place of her residence was in Centerville Township, outside of the limits of East St. Louis and the end of the car line was right there near her house; that when the car would be standing at the end of the car line she would get in on the north side to go down town; that Mr. Adams was the motorman and that she had ridden with him a long time; that after ringing the bell when the car got to Fortieth Street, she walked to the front of the car to the platform where Mr. Adams was; that after getting off the street car they could have to cross Bond Avenue; that all she remembered the motorman saying was, "This way out," and he opened the left front door of the street car, that was on her left side; that she didn't remember him saying anything else; that she stepped off the left side and thought she was getting off on the right side and didn't know she was getting off on the left side; that she didn't remember whether Adams got off the street car ahead of her or not; that when the car stopped and she got off, she stepped on the cinders in the middle of Bond Avenue; that she didn't remember how many feet it was from the cinders when she stepped over to the concrete slab; that she couldn't tell how many feet it would be from the side of the street car over to the concrete slab; that she had lived there five years and used the cars but she couldn't tell how far, that she didn't pay any attention to it; that she thought it was about the same

distance as between herself and the attorney examining her, but she could not estimate it in feet (by agreement of counsel the distance estimated by the witness was agreed to be five or six feet); that she didn't know how she stepped, that she must have stepped, but she didn't know how; that she didn't remember whether she was on the step or not, saying: "How can I remember?"; that she got hit; that she didn't remember whether she got on the street or not; that she knew she just made one or two steps and then got hit; that she made those steps on the street off the steps; that would be on the cinders; that she made one or two steps in the street, that she guessed that must have been the way; that what she meant was that she took one or two steps on Bond Avenue after she got off the street car; that she didn't think she had reached the edge of the concrete slab on the north side; that she didn't think that she had crossed that five or six feet to the edge of the concrete slab; that when she was stepping down on the step of the street car she didn't notice any headlights of any automobiles; that she didn't look towards Belleville; that she didn't look in that direction to see if there were any cars coming; that she didn't see the automobile at all before it hit her; that the automobile belonged to a man named Mannen; that she didn't think it a fact that Mannen, when his automobile struck her was on the concrete slab on the north side of Bond Avenue; that she thought he must have struck her on the cinder portion; that she didn't know how he was running; whether on the concrete slab or on the cinders; that she didn't see him before the accident, but, of course, saw him afterwards; that she was right in the road; that it was like any hard road; that she was in front of her house, or a little farther on; that that was the place where she was struck, somewhere near the front of her house; that the man who struck her stayed there with her; that they were at the hospital; that she came home in a taxicab; that she was in the hospital maybe two or three hours; that she didn't remember whether Mr. Mannen paid for the hospital or the X-Rays; that she knew Mr. Wesley Adams; that he came to her house to see her about her case and he is the one she gave her case to; that she didn't know that he had formerly worked for the street car company; that she didn't know who told her to sue the street car company and not Mr. Mannen, but thought it was Mrs. Reinhardt, who also lived in the apartment with her; that it was not true that the street car stopped at a regular stopping place and that she got off the street car and hurried across in front of it and into the path of the automobile; that in the five years she had lived there she had gotten on and off the street car there when it was raining; that it was not different from any other rainy night except that sometimes it didn't rain as hard; that it was an ordinary rainy winter evening about 9:30; that she had lived there for about five years and shopped

in the neighborhood and had friends in the neighborhood and that her children went to school there and her husband worked in the bakery there; that she did not tell Mr. Mannen after the accident that it was not his fault or that she walked in front of him without looking; that she didn't tell him anything; that she didn't remember whether Mannen made the arrangement for her to go back to the hospital for X-Rays or not; that she didn't remember whether she ever saw Mr. Wesley Adams or whether he ever told her that the motorman had been fired.

Josephine Golsch testified as follows: That she was on the street car with plaintiff the night of January 11, 1931; that at that time she lived at 4137 Bond Avenue, the same place as plaintiff; that she knew the plaintiff for about a year before the accident; that a colored man was on the street car besides herself and the plaintiff; that it was a one man car; that as the street car approached Forty-First Street plaintiff rang the bell and after that they went on up to the front platform and when they got there the conductor said: "This way out" and opened the left hand door; that then they were facing east and plaintiff started out first and got off and got hit and was dragged about fifteen feet; that that was all she knew, that she didn't see the automobile before it struck plaintiff; that the man driving the automobile stopped and picked plaintiff up and that she helped and they rushed her to the hospital and that she went with her.

On cross-examination she testified that she frequently took the street car to and from her place of residence; that generally they would get on and off at Forty-Second Street, which is the street east of their house; that occasionally she and the plaintiff would go out together in the street car in the evening; that she knew the motorman, Mr. Adams, by seeing him; that she had seen him for over a year or so prior to the accident; that she left there about six months after the accident; that the street car tracks had since been torn up; that they (she and plaintiff) were seated in the back of the street car and plaintiff pressed the button when near their house; that she knew it was approaching their stopping place; that their stopping place would be Forty-Second Street; that the car was close to Forty-Second Street when they rang the bell and it was when the car stopped that they got up and went to the front; that plaintiff walked ahead of her; that when they got to the front platform the motorman was just opening the door on the left, or north, side; that plaintiff got on the platform before she did; that she hadn't got off the car completely but was down on the step of the car, there being only one step, and that she was on it when the accident happened; that when plaintiff stepped down she didn't look to see what plaintiff was doing; that she knew plaintiff was down on the street but didn't know where, but did know that plaintiff was down after she was struck; that when she got down

on the step plaintiff was standing on the cinders; that she didn't remember whether plaintiff was standing then or still walking; that she was looking down at the step and watching her own steps and not plaintiff; that she saw her after the machine hit her and dragged her about fifteen feet; that when she saw plaintiff she was lying down on Bond Avenue about fifteen feet from the car step towards the back of the street car; that the automobile was traveling west and dragged her to the west; that she couldn't tell how many feet plaintiff was from the street car; that she tried to pick her up and the man that hit her helped pick her up and she went to the hospital with her; that she didn't see the automobile before the accident; that after the street car tracks were taken up she didn't know if they used the cinder portion of the street for parking purposes or not; that the lights were lit on the street car and the nearest street light was about a block away.

John V. Adams, the motorman, by deposition offered by plaintiff, testified substantially as follows: That he was the motorman in charge of the car at the time of the accident to plaintiff on January 11, 1931; that the car had complete control mechanism on both platforms so that it could be operated in either direction and that one simply moved the controller from one end to the other; that it had doors on both sides of both platforms; that there were three passengers (two women and a colored man) on the street car just prior to the accident; that he knew the two women, but didn't know the colored man; that it was raining; that they punched the bell; that the stop would be for 4200, for that bell, but he stopped the car for the two ladies, in order to accommodate them because it was raining, right in front of the house they lived at; that there were only three houses there; that he let them out on the side next to their house, which would be the left side; that the customary door would have been the right hand side, or south; that he told them that it was raining so hard that he would stop and let them out opposite their house because the street was full of water there; that after the first one stepped off there was a machine coming west on Bond Avenue and it hit her; that it was raining so he couldn't hardly see out there; that he couldn't tell how far away the machine was when first he saw its headlights; that the machine seemed to drag her a little distance; that he didn't see the automobile approaching at the time he opened the door; that when he saw the headlight there he didn't have any idea that the machine hit her; that when he got off the car, the driver of the machine had gotten out and got hold of her when he got there; that the driver who hit her took her into his machine and to the hospital and that there were several people around when he put her into the machine; that it was only a single track in the street and vehicular driveways on each side of the street and in the middle there was a kind of cinder

stuff; that it was dark there and no lights except what the company had, clusters of lights on the poles at the end of the block; that the lights of the street car were burning and so was the headlight; that he didn't warn this passenger about any approaching. automobile; that he didn't have time to do that; that he opened the door and she stepped right out and he didn't have any time to warn her.

On cross-examination this witness testified substantially as follows: That he didn't recall what the ladies said when they came up to him at the platform; that they got there about the time he stopped and were standing behind him on the left side; that at the time of the accident the other lady was standing on the step, though he could not be positive; that she might have gotten down on the ground; that he didn't see whether the ladies walked in front of his car or not; that there wasn't any reason for stopping there except to accommodate and help the ladies and save them from getting wet; that he was not sure whether the lady at the time she was struck was on the slab or not; that the end of the line was at the next block and after getting the names of the people after the accident he proceeded to the end of the line and changed the trolley; that his report to the company was not the truth; that they had instructions not to let anyone off at any place except the regular stopping place and he was willing to lie about that because if he had reported it the way it happened it would have cost him his job; that 4200 Bond Avenue is in Centerville Township, east of the limits of East St. Louis; that the city limits only go out as far as 3600.

On redirect examination the witness testified as follows: That the cinderized space between the edge of the track and the concrete pavement was from four to six feet wide on either side; that the overhanging of the street car would be fifteen inches; that the step that is used for alighting passengers is a folding step and when it is down it opens out in a level position; that it stands out a little beyond the side of the body of the car; that the overhanging of the street car and the width of the step would be about thirty inches all told from the width of the track; that the car was in good condition.

The colored passenger, Henry Harris, testifying for the defendant, stated that the two ladies who proceeded him, got off on the right hand side of the street car and that he followed them on that side; that the street car came to a stop at Forty-Second and Bond, at Hamilton's Drug Store on the south side, or right hand side, just where you would get off; that he saw them start around the front of the street car to the left and that he went on towards the drug store, on the southwest corner of Forty-Second Street and Bond Avenue, when he heard a scream and walked across in front of the street car and looked and saw two men pick a woman up and set her on the

running board of the machine; that there was the conductor who asked him for his name.

E. G. Johnston, called by defendant, testified as follows: That he lived at Mount Vernon, Illinois, and was a clerk in the money order and postal service of the U. S. Government at the post office, and had been in the government employ for twenty years; that on the evening of January 11, 1931, around nine or ten o'clock he was in a car with S. E. Mannen, coming towards East St. Louis on his way to serve on a federal grand jury there; that he was seated in the front seat of the Dodge coupe car, Mr. Mannen, the driver, being seated on his left; that it had been raining and the streets were rather slick; that at the time of the accident it was misting rain and two ladies crossed in front of the street car and walked over to the middle of the concrete slab while their car was moving westwardly; that they walked on the slab and one was a step or two behind the one that got hit; that she had started to cross the slab and saw their car and turned and went back toward the street car; that the other one hesitated and then started to turn back and finally lost her head and ran at an angle across the road; that Mannen threw on his brakes and the car started to skid and then they hit her with the left front fender and knocked her down; that he heard her scream; that he helped Mannen pick her up and set her on the running board and then ran across to the drug store to call an ambulance, but met the conductor coming back and he said he had already called it; that he then ran back to the car and looked at the lady's leg to see if it was broken, but it did not appear to be; that he took the name of the injured lady and the younger girl who was with her and sat on the running board with her and talked with them until the ambulance came and put her in and Mannen and he followed to the hospital and stayed there until she had been examined by the doctor at the hospital.

On cross-examination he stated that as they were driving west on Bond he saw these women coming around the front of the street car; that he didn't see them get off on the right front side of the car, but saw them when they were passing across the street car tracks and were probably between the rails at that moment; that their automobile was about seventy-five or one hundred feet away; that the women came across to the edge of the concrete slab on the north side and then retreated, at least one of them did, and the other started to run across the slab when the accident occurred; that he thought the front one got about to the middle of the slab; that he should say they were seven or eight feet north of the side of the street car; that they covered a distance of eleven or twelve feet all told from the time that he first saw them; that the younger woman retreated back to the south, the older woman (plaintiff) took a step or two to the north then turned back a step or two to the south, the younger woman got back

'off the slab and into the cinders and didn't start back north, but stayed toward the south side, but the older one did turn back a couple of feet and then started north across the slab, traveling to about the middle of the slab when struck, traveling about six feet forward; that altogether she may have traveled about twenty-two feet, was his best judgment; that the speed of their car was about twenty-five to thirty miles an hour and it was dark and foggy and had been raining; that he did not have much trouble seeing their movements; that the headlights on the Dodge car towards them and the street car· headlight down the track toward them revealed them; that it was only after that that he distinguished between the younger and the older woman; that the machine traveled about seventy-five or one hundred feet while the older one was covering about twenty-three feet; that during' this seventy-five feet the driver of the car threw on the brakes; that he (witness) called to him to look out and he kicked his brakes on and the wheels of their car started to skid and were skidding at the time they struck the woman; that he said to Mannen when he first saw them coming, to "look out;" that they were then about seventy-five or one hundred feet away; that he could not say how far their car skidded; that their automobile went about a car length after the accident and did swerve slightly; that the left front fender struck her and that they set her down afterwards on the running board; that it was misting but not raining hard; that he had known Mannen for about five years; that Mannen lived at Mount Vernon and installed pumps for the Phillips Petroleum Company; that on this occasion Mannen was coming to East St. Louis and was a friend of his and he took that occasion to come in with him.

Samuel Castiller, the driver of the ambulance in which plaintiff was taken to the hospital from the place of the accident, testified that when he arrived the street car was stopped at Forty-Second and Bond, at the drug store on the southwest corner thereof, and an automobile was stopped just northwest of the street car on the north side of Bond and that there were two men and the injured woman sitting on the running board of the automobile and that the men helped put the woman on the cot in the ambulance and he drove her to the hospital; that he was familiar with the neighborhood and the concrete slabs on either side of the strip of cinders were extensively used for vehicular traffic.

A photograph of the place of the accident, taken in the early part of 1932, was put in evidence by defendant. The street car tracks had been taken up since the accident, but otherwise the conditions were shown to be the same. The camera was shown to have been set at the southwest corner of Forty-Second and Bond, where the Hamilton Drug Store is located, and looking northwest when the photograph

was taken; it shows the three houses on the north side of the 4100 block and the street in front of them, which appears to be perfectly level.

The written report of Motorman J. V. Adams, put in evidence by defendant, shows, among other details, that the street car stopped at Forty-Second and Bond and that he got off the car to put his trolley back and that all three of his passengers got out and the two ladies walked across in front of the street car and one of them was struck by an automobile going west; that his attention was attracted when he heard her scream; that she was back from the hospital at her home on his next trip and he stopped to see her and she said she was not hurt much, not anything serious.

At the close of all the testimony defendant offered an instruction in the nature of a demurrer to the evidence, which the court refused.

The court gave an instruction at the request of plaintiff, in substance authorizing the jury to find for the plaintiff if they found that the motorman negligently failed to warn her of the danger of being struck by an automobile in alighting from the street car under the circumstances.

Instructions were given at the request of defendant that if the jury found that plaintiff got off the street car on the right hand side and walked around in front of the street car to the north side of the street and was then struck, she was not entitled to recover. The court refused an instruction asked by defendant submitting the question of plaintiff's contributory negligence to the jury.

The jury returned a verdict in favor of plaintiff in the sum of $2500 and after an ineffective motion for a new trial defendant brings the cause to this court by appeal for review.

We have reached the conclusion that the trial court should have given the instruction in the nature of a demurrer to the evidence offered by defendant at the close of all the testimony.

When one alights in safety from a street car the relation of carrier and passenger ceases to exist. A distinction exists between the discharge of passengers from street cars and those discharging them on their own stations maintained by the carrier, as a railroad company. [Lacks v. Wells, 329 Mo. 327, 44 S. W. 154.]

This distinction is fully recognized by our Supreme Court in Lacks v. Wells, supra, and the following excerpt from the text in 4 R. C. L. 1047 is quoted therein approvingly, viz.:

"The general rule just considered that in the case of a carrier having exclusive control or occupation of its tracks and stations, one traveling may still retain the status of a passenger after alighting from the carrier's vehicle, is from the nature of things not applicable to carriers not so situated, as for instance in the case of persons traveling on street railway cars. While a person attempting to alight

from a street car remains a passenger until he has accomplished the act of alighting in safety, and the carrier owes to the passenger attempting to alight that very high degree of care and attention which the law puts upon it generally to the end of promoting the safety of its passengers, and will be liable for negligent injury to the passenger while so alighting, it is the generally accepted view that one who has alighted from a street car and is in safety upon the highway is no longer a passenger, but is thenceforth a traveler upon the highway, and subject to all the duties and obligations imposed upon such travelers, and the railway company is not responsible to him as a carrier for the condition of the street, or for his safe passage from the car to the sidewalk."

We also quote from the opinion in Lacks v. Wells, supra, the following, which throws much light on the subject, and emphasizes the fact that the weight of authority is in favor of the proposition that when the passenger safely alights from a street car he ceases to be a passenger and thenceforth must look out for himself in respect to the perils of the street like all other "travelers upon the highway," viz.:

"Much case law has grown out of injuries sustained by persons struck by other vehicles while alighting from street cars or immediately thereafter. In Wood v. North Carolina Pub. Serv. Corp., 1 A. L. R. 942, 944, 174 N. C. 697, 94 S. E. 459, it was held by a divided court that defendant street railway company was negligent in permitting 'plaintiff, a passenger, to alight on a roadway, along which one or two automobiles were passing each minute, immediately in front of an automobile moving rapidly, without warning, and when the conductor of the defendant, who knew of the dangers of the road, did not look to see if any danger was approaching.' See, also Loggins v. Southern Pub. Utilities, 181 N. C. 221, 106 S. E. 822, and Traction Co. v. Raymond (Miss.), 128 So. 327, the latter disclosing circumstances that would distinguish it from the instant case. These rulings, however, are diametrically opposed to the present weight of authority appearing in text and annotation of Chesley v. Waterloo C. F. & N. Railroad Co., 12 A. L. R. 1366, 188 Iowa, 1004, 176 N. W. 961. [And see, also, Jacobson v. Omaha & C. B. Street Ry. Co., 31 A. L. R. 563, 109 Neb. 356, 191 N. W. 327; and Ruddy v. Ingebret, 44 A. L. R. 159, 164 Minn. 40, 204 N. W. 630.]

"In the Chesley case, the destination of plaintiff's intestate was not shown. The car in which he was riding was stopped midway between streets because of a car standing on the same track ahead of it. Passengers desiring to enter or leave the car at this point were frequently permitted to do so, and on this occasion when the car stopped for a few seconds this passenger arose from his seat, proceeded to the exit, the door was thrown open and he alighted, took a step or two in the direction of the curbing and was struck by a passing automobile

sustaining injuries from which he died. Held, the court did not err in directing a verdict for defendant.

"In the Jacobson case, as plaintiff's intestate descended from a street car, which was stopped at a regular stopping place, 'she took one long step out onto the pavement, and was just in the act of swinging her other foot forward, to take another step, when she was struck by a motorcycle which was just then passing close to the car at a great speed.'. In affirming judgment .on a directed verdict for defendant the court said: 'We cannot say that a street railway company is, as a general rule, required to watch for and to warn its passengers who are about to descend into the street, against those obvious dangers from moving vehicles which are incidental to and common on the street and are known to all.' While this rule is not inflexible and is subject. to exceptions (Jacobson case, p. 571), yet any other rule would impose upon the carrier a duty not only unreasonable but inconsistent with the practical operation of its cars, if not altogether impossible of performance. [Farrington v. Boston Elev. Ry. Co., 202 Mass. 315, 88 N. E. 578.] The Jacobson opinion approves the doctrine and ruling in Ellis v. Hamilton Street Ry. Co., 48 Ont. L. Rep. 380, a case in which a street car had stopped, at the instance of the passenger, in the middle of the block, and not at the customary stopping place. Upon leaving the car, and at a moment when the court recognized that the relation of passenger and carrier still continued, she was struck by a passing vehicle. The court held that there was no evidence of any negligence on the part of the street car company causing the injury which would support the findings of the jury in favor of the plaintiff.

"In the Ruddy case, plaintiff was standing on the front steps of the street car when it stopped. She undertook to alight in the usual way, but a truck, being driven rapidly and in violation of law, struck her before her feet were on the pavement. There was a statute in force requiring the driver of the truck to stop not less than 'ten feet behind the street car.' The street car was equipped with a mirror by which the motorman could see the rear gates in order that he might know when he could safely close them. Plaintiff urged that it was defendant's duty to observe the approach of automobiles and protect alighting passengers from danger of being struck thereby. In denying this claim and affirming judgment on a directed verdict for defendant the court thus stated the practical reasons underlying this doctrine (l. c. 161):

" 'But this is an obvious danger incident to all streets. It is a peril known to all passengers. The danger may come without warning, and, as in this case, it usually results from a violation of the statutory prohibition. In fact, the risk from such danger is more apparent to the passenger than to the motorman, because the passenger can, and

should, remain on the street car until he knows that it is safe for him to step onto the street. Being able to so effectually care for himself, the law should not charge some one else, who obviously cannot do so as well, with the duty of protecting him from such obvious and common dangers. It would, under the circumstances, be impracticable to require the company to take the responsibility of protection against these obvious dangers of the street. The motorman has no way of knowing when a driver will instantaneously become a wrongdoer. He at best could have but little judgment as to these dangers when he is attending his usual duties. The imposition of this additional and exacting duty would necessarily delay traffic with little hope of successful avoidance. The company is not the creator of these conditions or street dangers and they are beyond its control. To say that its duty requires it to protect the passenger from them is, in effect, to make it an absolute insurer of safety to the passenger. The very nature of these obvious dangers, which are necessarily within the knowledge of all, and which do not include defective equipment or manipulation of the company's instrumentalities, makes it impracticable for the company to cope with them, while, on the other hand, they may be successfully avoided by ordinary diligence on the part of the passenger in stepping from the street car into the street. The law gives him all reasonable time, under the circumstances, to safely act and his right in this respect will be zealously guarded. He is not required to advance into the zone of danger. He is given a full view of the street in all directions and he may control his movements by the necessities of the occasion. He should determine when his path is safe. Having this privilege, he cannot charge actionable negligence to the company for failure to discharge a duty which is his. For him, the duty is simple and easy. For the company, the responsibility would be so burdensome and impracticable that it would be unreasonable, hence cannot be held to be its duty.'

"As said in Craig v. Railroad, 142 Mo. App. 314, 317, 126 S. W. 771; 'The carrier is not the insurer of the safety of his passenger, who is held to exercise reasonable care for his own safety when in the act of alighting from the carrier's conveyance.'

"In the recent case of Downs v. Northern States Power Co. (Wis.), 228 N. W. 471, decided January 7, 1930, the complaint alleged that plaintiff was a passenger on one of defendant's street cars; that she rang the bell and stood at the door of the street car ready to alight at the customary stopping point at a street intersection; that the car ran past the intersection and stopped in front of plaintiff's home; that the vestibule door was opened, inviting plaintiff to alight; and that, as she was in the act of bringing her left foot to the pavement, she was struck and injured by a passing motorcycle which was traveling in the same direction as the street car. The substance of the al-

legations of negligence was that the company failed to perform the duty imposed on a carrier of passengers when it stopped its car in the middle of the block, not at a usual stopping place, and invited plaintiff to alight without warning her of the danger of injury from the passing motorcycle which struck her. In approving the action of the trial court in sustaining defendant's demurrer to the complaint the opinion quotes liberally from the opinions in the above cited Chesley, Jacobson and Ruddy cases.''

The testimony of plaintiff in the instant case, which we have set out in meticulous detail, is confusing, contradictory, and unintelligible in part, as, when she professes inability to remember patent and obvious facts, and claimed that when she went out at the left hand door of the street car, she thought it was the right hand door, and that when she got off the car on the north, or left side, that she thought she was getting off on the right, or south side.

But, giving it the most favorable interpretation possible under the circumstances, and the benefit of all legitimate inferences, we are satisfied that under her own testimony it clearly appears that she is not entitled to recover. Suppose the motorman had warned her prior to her leaving the car to be careful because automobiles might be coming from the east on the slab, he would only be telling her what she already knew probably better than he knew. She had lived there five years and had used the car line frequently in rainy weather as well as in fair weather and could look out when at home and see the vehicular traffic passing on the ten foot concrete slabs on either side.

Statutes which require those in charge of engines pulling trains on railroads to give warnings by ringing the bell or sounding the whistle to warn pedestrians from using the tracks, are so construed that an individual who already sees the approach of the train may not use a failure to give these signals as a basis for a recovery. So, a failure to warn plaintiff of something which she already knew about, likewise could not be used as a basis of recovery.

There are strong grounds for the belief that the jury, by its verdict, reached an erroneous conclusion (even though it is binding on us as a reviewing court) in rejecting the testimony that the street car did stop at its regular stopping place at Forty-Second and Bond and that the three passengers, plaintiff, Josephine Golsch and the colored man, Henry Harris, all got off the car on the right or south side of the street near the Hamilton Drug Store, instead of stopping in the middle of the 4100 block at or near the front of plaintiff's house.

The colored passenger testified that the street car did stop there at Forty-Second and Bond, adjacent to the Drug Store, which was its regular stopping place, and that he followed the two women out and that they all debarked through the right or south door and that the two women went north around the front of the street car.

Mr. Johnston, the guest in the Dodge coupe which struck plaintiff, testified that he saw the two women pass from the south side of the street to the north side in front of the stopped street car.

Mr. Castiller, the driver of the ambulance which took plaintiff to the hospital, testified that the street car was standing at its regular stopping place at Forty-Second and Bond when he arrived; and the motorman, Adams, in his written report to the company, set out that he did stop the street car at Forty-Second and Bond and that the two ladies crossed over in front of the street car. He testified at the trial that his report was purposely falsified in order to avoid the probability of losing his job for stopping in the middle of the block instead of at the regular stopping place. The probability that the motorman testified falsely on this point at the trial is much stronger than his claimed falsification in his written report made to the company immediately following the occurrence. The plaintiff testified that all the motorman said when he opened the door on the left hand side, was, "This way out." How unusual and unnatural it is for a male, doing an act of gallantry for two ladies, by stopping the street car in the middle of the block and in front of their house, to protect and shield them from the effects of the rain, to indulge in such self-abnegation as to refrain from telling them of the favor he was bestowing on them. It is not shown that he made any apology to his colored passenger, who, if this story is true, was required to walk the half block in the rain before reaching the regular stopping place.

However, the trial court gave an instruction that if the jury found that the street car was stopped at its regular stopping place; Forty-Second and Bond, and the two women went across the street in front of the car, and the plaintiff was struck and injured, then she could not recover. That, of course, was a correct instruction, and is in harmony with the law as heretofore set out, that when the passenger is discharged from a street car safely on the ground, no peril which the discharged passenger may meet on the street thereafter can be charged in any manner against the street car company.

However, assuming the street car was stopped at or near the middle of the 4100 block opposite the plaintiff's residence, that does not change the rule so as to justify a recovery for plaintiff. It is obvious that the perils of the street were no greater there than a half block farther east, where the regular stopping place was, at Forty-Second and Bond. The street was uniform and level and the vehicular traffic was the same at both places.

While the plaintiff was testifying on cross-examination she was shown the photograph, afterwards offered in evidence by defendant, and said, in respect to it, "That is exactly like the street looks, with the concrete on either side and the cinder portion in the middle."

Plaintiff's own testimony showed that she got off the street car on the ground safely. It was six feet of cinderized street, from the point where her foot was first placed on the ground to the south edge of the pavement. She would have to take two very long steps or three moderate ones before reaching the south edge of the pavement. She was in a zone of safety when she stepped from the street car step to the cinder strip and from that point on, and from that moment on, it was incumbent on her to watch for herself and avoid the perils of the vehicular traffic which she knew always existed on the ten foot concrete slab. Yet she testified that she walked to the slab without looking east at all and she knew that the cars using the north slab always came from that direction and she knew from her five years residence there, how extensive the traffic was and how dangerous it was, particularly to pedestrians. Her admitted failure to look for the approach of cars under the circumstances showed such gross negligence on her part as to preclude any right of recovery against this defendant.

In the recent case of Madden v. Red Line Service (Mo. App.), 76 S. W. (2d) 435, this court, speaking through Judge BECKER, used the following language:

". . . The mere occurrence of negligence and injury does not make for liability. There must be a direct connection between that negligent act and the injury. [Borack v. Mosler Safe Co., supra; Daneschocky v. Sieble, 195 Mo. App. 470, 193 S. W. 966.] The negligence must be the proximate cause of the injury. Plaintiff throughout carried the burden of proving not only the fact of the negligence charged, but also to show a direct connection between such negligence and the injury. [Coble v. Ry. Co. (Mo.), 38 S. W. (2d) 1031.]

". . . While the general rule in this regard, as to a mere witness, is that no set of facts can ordinarily arise upon any matter of contradictory evidence that will oust the jury of their privilege in a law case of resolving the truth of such contradiction, yet the testimony of a plaintiff in her own case on trial may amount to a judicial admission which shows that she is not entitled to recover; and such a judicial admission, unless avoided by explanation, is always prima facie binding and conclusive. [De Lorme v. St. Louis Public Service Co. (Mo. App.), 61 S. W. (2d) 247, l. c. 250; Steele v. Ry. Co., 265 Mo. 97, 175 S. W. 177; Weddle v. St. Joseph Ry., Light, Heat & Power Co. (Mo. App.), 47 S. W. (2d) 1098, l. c. 1101; Mertens v. McMahon (Mo. App.), 28 S. W. (2d) 456. See, also, State ex rel. Weddle v. Trimble, 331 Mo. 1, 52 S. W. (2d) 864; Graefe v. Transit Co., 224 Mo. 232, 123 S. W. 835; Southern Bank of Fulton v. Nichols, 202 Mo. 309, l. c. 323, 100 S. W. 613.]'"

It is clearly manifest that defendant had nothing to do with the vehicular traffic on the concrete slab over which plaintiff was en-

deavoring to cross. The alleged failure of the motorman to warn plaintiff of the existence of such vehicular traffic had no causal connection with the accident, because she knew of the existence of such traffic and its dangers as well as he. The lighted street car revealed the concrete slab. She knew of its location anyway, and its distance from the street car from which she had alighted. She walked to the south edge of the slab and onto it of her own accord and without looking to the east for the approach of automobiles, when "to look was to see." Defendant's failure to warn her of the dangers from collision in crossing the concrete slab, even if it could be regarded as negligence, was not the proximate cause of plaintiff's injury. Her conceded negligence in failing to look, or her negligence combined with the negligence, if any, of Mannen, the driver of the automobile which struck her, constituted the proximate cause of the injury. And, in the event of either contingency she was not entitled to recover.

It follows that the judgment of the trial court should be reversed, and, it is so ordered. *Becker* and *McCullen, JJ.,* concur.