**Zoe Ella LIESER, a/k/a Margie Lieser, Plaintiff-Respondent,**

v.

**BI–STATE DEVELOPMENT AGENCY OF the MISSOURI–ILLINOIS METROPOLITAN DISTRICT, a body corporate and politic, Defendant-Appellant.**

**No. 58446.**

Supreme Court of Missouri, En Banc.

May 13, 1974.

Luke, Cunliff, Wilson, Herr, Chavaux & McCluggage, Paul H. Chavaux, Terry A. Bond, St. Louis, for plaintiff-respondent, Zoe Ella Lieser, a/k/a Margie Lieser.

Boas, Schneider & Walsh, Paul B. Hunker, Jr., St. Louis, for defendant-appellant, Bi-State Development Agency.

Robert C. McNicholas, City Counselor, James J. Gallagher, Associate City Counselor, for defendant-appellant, the City of St. Louis.

FINCH, Judge.

Plaintiff obtained a verdict for $2,000.00 for personal injuries against Bi-State Development Agency of the Missouri-Illinois Metropolitan District (Bi-State) and the City of St. Louis (City). Both defendants appealed but subsequently the City dismissed its appeal. Thereafter, the Missouri Court of Appeals, St. Louis District affirmed the judgment as against Bi-State. We then sustained its application to transfer and we now decide the case as though it came here on direct appeal. Mo.Const., Art. V, § 10, V.A.M.S.

The single issue presented is whether plaintiff made a submissible case against Bi-State for injuries suffered when, although she descended from the bus without injury onto a regularly designated bus stop located immediately adjacent to the street curbing, she stumbled and fell over a somewhat raised concrete slab after she had walked 15 to 18 feet from the point of debarkation along an asphalt walkway located on city property.

Plaintiff had been employed for six years as a practical nurse by a woman who lived near the intersection of Pershing and DeBalivere in St. Louis. Most of the time she rode Bi-State's Union bus in going to and from her work. That bus discharged and picked up passengers at its regularly scheduled bus stop on city property located adjacent to the north curb of Pershing approximately 90 feet east of DeBalivere.

On the morning of June 14, 1968 plaintiff rode a Union bus to work and at approximately 7:20 a. m. she, along with other passengers, alighted therefrom at the Pershing bus stop. The weather was clear and the pavement dry. Some of the passengers left the bus by the front door and others, including plaintiff, disembarked through the rear door.

Plaintiff stepped from the bus onto a blacktopped strip adjacent to the north curb of Pershing. That strip, which had been there at least since 1962, extended west along the curb all the way to the sidewalk which ran along the east side of DeBalivere. No witness testified as to the width of this blacktopped strip but a photograph introduced into evidence would indicate that it was perhaps three feet wide. This blacktopped strip was separated from the sidewalk on the north side of Pershing Avenue by a dirt strip on which grass and weeds were growing. These had not been cut and passengers, including this plaintiff, generally walked along the blacktopped strip until they reached the DeBalivere sidewalk.

After disembarking plaintiff walked west along the blacktopped strip. After she had gone a distance of 15 to 18 feet she tripped over the edge of a concrete slab which surrounded a manhole cover located in the middle of the blacktopped walkway. She struck her face against the bus stop post, located just west of the concrete slab and adjacent to the street curb, causing injuries for which she brought this action.

The concrete slab in question covered a sewer inlet from the street into a storm

sewer and appears from the photograph to be approximately four feet square. It appears to be almost level whereas the blacktopped walkway slopes gradually with the terrain toward the edge of the curb. As a result, at the north edge of the concrete slab the blacktop appears to be almost flush with the concrete, but as the blacktop slopes toward the curb, there is a gradual difference in height between the slab and blacktop of up to two or three inches.

The walkway where plaintiff and the other passengers were discharged and where they were walking at the time plaintiff fell was located on city property. Plaintiff submitted her case against the city on the basis of its failure to use ordinary care to remedy the condition caused by the raised concrete manhole which allegedly made the walkway not reasonably safe when the city knew or should have known of the dangerous condition. She submitted her case against Bi-State on the theory that in stopping its bus at such a point in relation to the raised concrete slab it failed to select a reasonably safe place for plaintiff to alight from the bus.

■ It is well established that a carrier is required to exercise the highest degree of care to avoid injury to passengers alighting from its vehicle and that such duty continues at least until the passenger has left the vehicle and is on the ground in safety. The question which arises from time to time is whether (and to what extent) the passenger-carrier relationship and the duties incident thereto continue thereafter, thereby creating a jury issue as to whether the presence of some condition such as the higher manhole cover results in the point of debarkation not being a safe place to alight.

Bi-State's application to transfer to this court was predicated on the assertion that the opinion of the court of appeals in extending the zone of Bi-State's obligation to its passenger beyond the point of safe debarkation relied on the decision of this court in Gott v. Kansas City Rys. Co., 222

S.W. 827 (Mo.1920) and its own decision in Feldotto v. St. Louis Public Service Company, 285 S.W.2d 30 (Mo.App.1955) but overlooked this court's decision in Lacks v. Wells, 329 Mo. 327, 44 S.W.2d 154 (1931) even though it was subsequent to the decision in Gott. Bi-State's position was that the court of appeals decision in this case was inconsistent with a rule announced in Lacks to the effect that a carrier's liability for injury to passengers does not extend beyond the immediate area of debarkation on public property.

While not specifically delineating the point at which she would recognize that the carrier-passenger relationship should terminate, plaintiff asserts that in the instant case it continued as she walked along the walkway adjacent to Pershing and that a jury issue existed as to whether in view of the raised manhole and the attendant danger Bi-State had selected a reasonably safe place for her to alight. This view was adopted in the opinion of the court of appeals.

The case of Gott v. Kansas City Rys. Co. and Feldotto v. St. Louis Public Service Company, both supra, deal with factual situations which differ materially from that presented in this case. In Gott, a streetcar discharged its passenger one block beyond the station at which she had told the motorman she wanted to alight. The motorman told her to walk back to the station where she had intended to alight. While doing so on defendant's right-of-way, she was struck by another streetcar. Saying that in this situation the carrier-passenger relationship did not terminate at the spot where plaintiff alighted without injury, the court held that since the streetcar operator was familiar with the surroundings and plaintiff was not, the injury received would be a reasonable expectation of the act of putting plaintiff off beyond her announced destination.

In Feldotto the plaintiff was descending from the bus on the exit steps and had placed her foot on the pavement when she

was struck by an automobile passing the bus on the right. She had not completely alighted when she was hit. Hence, the carrier had not actually discharged plaintiff in a place of safety.

■ If in the instant case there had been a hole or substantial unevenness immediately beneath the steps by which plaintiff descended and she had stepped there and fallen, we would have a situation comparable to that in Feldotto in that plaintiff then would have been injured in the act of alighting. This would have been before the carrier-passenger relationship terminated and a jury issue would exist as to whether the carrier had selected a safe place for debarkation. This would be true even though the defective spot onto which plaintiff stepped was located on city-owned property. Actually, such a situation was presented in the case of Beahan v. St. Louis Public Service Co., 213 S.W.2d 253 (Mo.App.1948). In that case, the bus on which plaintiff was a passenger stopped at a regular bus stop at the southeast corner of 14th and Washington in the city of St. Louis. At that point there was a broken place in the sidewalk variously estimated at from 1 to 2½ inches in depth and 8 to 10 inches square. The bus driver stopped at a point which resulted in this defective sidewalk being immediately below the steps by which passengers would be discharged. Plaintiff failed to discover the break in the surface and when she stepped into the hole in the sidewalk, she fell and was injured. The court of appeals recognized the general rule that the carrier has an obligation to select a reasonably safe place to discharge

passengers and that the carrier-passenger relationship continues until the passenger has left the car or bus and descended to the sidewalk in safety. The court then said:

"Nor is it any the less the street railway or bus company's duty to exercise the highest degree of care to select such reasonably safe place that the street or sidewalk where it must discharge its passengers is outside its own control. If there is a defect in the street or sidewalk which is likely to cause injury to an alighting passenger, the company must stop its car or bus at a point beyond or short of the defect, or it must warn the passenger unless the danger confronting him is so glaring as to be as obvious to him as to the operator; and where it stops its car or bus at such a place that a passenger must alight at a point on the street or sidewalk which is defective and likely to result in injury, the company is guilty of negligence, and if the passenger is injured while so alighting, the company is liable for the damages incurred. Caley v. Kansas City, 226 Mo. App. 934, 48 S.W.2d 25; Moses v. Kansas City Public Service Co., 239 Mo.App. 361, 188 S.W.2d 538; Senf v. St. Louis & Suburban Ry. Co., 112 Mo.App. 74, 86 S.W. 887." 213 S.W.2d 1. c. 255.

Neither Gott nor Feldotto is analogous to the factual situation presented by Mrs. Lieser's case herein where she did alight in safety and was injured subsequently during the time she was walking on the city-owned and maintained walkway enroute to her ultimate destination.[1]

---

1. None of the outstate cases cited by plaintiff (and footnoted in the court of appeals opinion) as extending the zone within which the carrier-passenger relationship continues beyond the point of debarkation deal with factual situations comparable to that herein presented. In Peterson v. City of Seattle, 51 Wash.2d 187, 316 P.2d 904 (1957), the bus was sliding on an icy pavement and the driver stopped with the front end of the bus near the center line of the street and the rest angled across the two traveled lanes for traffic going in that direction. The driver told passengers that that was it and that they should alight. He gave plaintiff no assistance and she slipped and fell on the street while trying to get to the curb. In Texas, New Mexico & Oklahoma Coaches, Inc. v. Williams, 191 S.W.2d 66 (Tex.Civ.App.1945), the driver, on a foggy, misty day, pulled the bus to the left curb of a two-way street, discharging plaintiff from the right side of the bus onto the street where he also placed her four pieces of luggage. The bus then left and plaintiff was struck while trying to move her luggage to the sidewalk. In German v. Muskingum Valley Transit Co.,

Reference has been made to Lacks v. Wells, supra, and the failure of the court of appeals opinion to discuss or distinguish it. In that case plaintiff was a passenger on a streetcar which regularly stopped at the corner of Allen and Jefferson in St. Louis. On this particular morning the streetcar stopped midway between Geyer and Allen streets rather than at the regular stop. Plaintiff disembarked safely but while still on the street was struck by an automobile attempting to pass the streetcar. She sought recovery on the basis that the streetcar, in depositing her where there was no safety zone or platform, did not provide a reasonably safe place for her to alight.

In ruling against plaintiff, this court said:

"But there is a well-recognized distinction between railroads and street railways as to the status of a passenger after alighting from a carrier's vehicle. It is thus noted in 4 R.C.L. p. 1047: 'The general rule just considered that in the case of a carrier having exclusive control or occupation of its tracks and stations, one traveling may still retain the status of a passenger after alighting from the carrier's vehicle, is from the nature of things not applicable to carriers not so situated, as for instance in the case of persons traveling on street railway cars. While a person attempting to alight from a street car remains a passenger until he has accomplished the act of alighting in safety, and the carrier owes to the passenger attempting to alight that very high degree of care and attention which the law puts upon it generally to the end of promoting the safety of its passengers, and will be liable for negligent injury to the passenger while so alighting, it is the generally accepted view that one who has alighted from a street car and is in safety upon the highway is no longer a passenger, but is thenceforth a traveler upon the highway, and subject to all the duties and obligations imposed upon such travelers, and the railway company is not responsible to him as a carrier for the condition of the street, or for his safe passage from the car to the sidewalk.'" 44 S.W.2d 1. c. 156.

Although Lacks has never been overruled and has been followed subsequently, plaintiff attacks it as being wrong and out of harmony with the modern trend in cases.

■ We need not and do not consider the factual situation presented in Lacks or whether the rule therein announced is the proper one to govern a factual situation comparable to the one presented in that case. That is not the issue before us. However, the rule announced in Lacks is, we conclude, a proper one to apply in the factual situation here presented. It is the rule which was applied in the comparable case of Meyer v. St. Louis Public Service Co., 253 S.W.2d 525 (Mo.App.1952). In

94 N.E.2d 52 (Ohio Com.Pl.1950), the plaintiff was carried past her destination and was discharged in darkness on a busy highway to walk back to where she intended to alight. While walking along the road, she was struck. In Sykes v. Langley Cabs, Incorporated, 211 Va. 202, 176 S.E.2d 417 (1970), a taxi cab took two men to a pier. It drove onto the pier and plaintiff's evidence indicated it stopped within one foot of the edge of the pier. The cab driver then discharged one of the passengers from the right hand door and when he stepped out of the cab, he fell into the water and was drowned. In Jaxon v. City of Detroit, Department of Street Railways, 379 Mich. 405, 151 N.W.2d 813 (1967),

plaintiff fell while alighting from the bus which had stopped with the exit door 4 to 5 feet out in the street instead of next to the curb as was usually the case and as she had expected. In Brewer v. City of Detroit, Department of Street Railways, 11 Mich.App. 465, 161 N.W.2d 410 (1968), plaintiff was discharged at the curb at a regular bus stop. It was very icy and slippery, and after the bus pulled away and while plaintiff was still at the curb, she fell and was injured. The court held there was a jury issue as to whether the driver should have known that the spot where he discharged plaintiff was so slippery as not to be reasonably safe.

that case plaintiff alighted from defendant's bus at a regular stop on St. Charles Rock Road. He then walked to some steps located on public property and started to descend them from St. Charles Rock Road to the old right-of-way formerly used by defendant when it had operated streetcars. These steps had been built 15 or 20 years earlier during the time when streetcars were operating and had been used by persons to go from the streetcar right-of-way (which was lower in elevation) to St. Charles Rock Road. Plaintiff used these steps regularly in going between his home and the bus stop on St. Charles Rock Road.

On the day in question, the steps were covered with leaves and mud plus ice from a storm the preceding day. The evidence indicated that the leaves and mud had been there for some time and the steps also had been icy that morning when plaintiff used them when coming from his home to catch the bus. As plaintiff descended the steps on the afternoon in question, he fell and was injured. He then sought recovery from the defendant on the basis that it had failed to provide him with a reasonably safe place to alight.

In holding that the trial court should have directed a verdict for defendant, the appeals court cited and relied on Lacks v. Wells, supra, and on Smuzynski v. East St. Louis Ry. Co., 230 Mo.App. 1095, 93 S.W. 2d 1058 (1936) which case had followed the rule announced in Lacks. In so holding, the court said:

"In the case before us plaintiff was safely discharged upon the public highway and the relationship of passenger and carrier was thereupon terminated.

"Plaintiff contends that the aforesaid cases and the rule announced in them, relied on by the defendant, to the effect that once a passenger has alighted he is no longer a passenger, are not applicable to the issues here involved. He points out, that since the defendant's right-of-way was adjacent to the State's right-of-way, the defendant had a right of ingress and egress to its property, and this right of ingress and egress could be used and had to be used by its passengers. We are not impressed with this contention. It must be remembered that the steps on which plaintiff fell were located on the public highway and were not on the property of the defendant. To hold that it is the duty of the defendant to keep in repair all steps, streets, sidewalks and any other facility leading to and from its right-of-way, would be to impose on the defendant an unreasonable and impossible burden. Ordinarily, the duty to keep these facilities in good repair and free from obstructions is imposed upon the municipality or other public body entrusted with their care. Nimmo v. Perkinson Bros. Const. Co., Mo., 85 S.W.2d 98; Berry v. Emery, Bird, Thayer Dry Goods Co., 357 Mo. 808, 211 S.W.2d 35." 253 S.W.2d 1. c. 529.[2]

As the court observed in the foregoing quotation from Meyer, to impose an obligation on a carrier to be responsible for and maintain sidewalks, walkways, steps or other comparable facilities located

---

**2.** The court in Meyer went on to discuss the effect of certain barricades erected by the defendant and the implied invitation resulting but concluded that this would only obligate the defendant to warn plaintiff of the condition of the steps, that under evidence the plaintiff was shown to have used the steps regularly and be thoroughly familiar with them and, hence, there was no basis for recovery on that theory either. In this case plaintiff sought to recover on the basis of failure to provide a safe place to alight, not on a theory of a failure to warn. In any event, as in Meyer, the evidence shows that the plaintiff regularly used this bus stop and had observed and was familiar with the concrete slab encasing the manhole. Hence, a warning would simply have advised her of that which she already knew.

on public property would impose an unreasonable and impossible burden. The testimony in this case indicated that Bi-State has approximately 10,000 bus stops, most of which are located on publicly-owned sidewalks or walkways.

Furthermore, if the carrier-passenger relationship were to be continued during the period in which passengers are leaving the point of safe debarkation and going elsewhere by way of public sidewalks, the question arises as to the distance or length of time such relationship would be continued. Would it be for 25 feet, 50 feet, a quarter of a block or for some other distance?

■ We conclude that where the passenger has alighted in safety at the edge of the street onto a regular bus stop located on a publicly-owned sidewalk or walkway and the passenger can exit therefrom by means of the public sidewalk or walkway, the carrier-passenger relationship terminates once the passenger has alighted in safety and the carrier is not liable for injury to passengers received as a result of defects in the publicly-owned sidewalk or walkway in the course of traveling from the point of debarkation to the passenger's ultimate destination.[3]

In the court of appeals opinion the court, in holding that the carrier-passenger relationship should not terminate simply because the passenger stepped safely onto the ground, undertook to demonstrate the correctness of that conclusion by posing a hypothetical situation wherein the carrier would discharge a passenger on a 2'x2' concrete slab surrounded on all sides except the street by quicksand. We do not consider that hypothetical situation to be comparable because there the passenger is marooned and has no way to go in safety except to go out into the street. That was not the situation in this case nor in the

usual case wherein a passenger, after alighting at a regular bus stop, proceeds over a public sidewalk to his destination. In the situation with which we deal, passengers regularly used the walkway from the bus stop to the sidewalk on DeBalivere and the plaintiff herself had done so several times a week over a period of six years.

We reverse the judgment against Bi-State and remand with directions to enter judgment in favor of Bi-State.

DONNELLY, C. J., and SEILER, MORGAN, HOLMAN and HENLEY, JJ., concur.

BARDGETT, J., concurs in result in separate concurring opinion filed.

BARDGETT, Judge (concurring in result).

I concur in the result reached in this case but not upon the authority of Lacks v. Wells, 329 Mo. 327, 44 S.W.2d 154 (1931), and Smuzynski v. East St. Louis Ry. Co., 230 Mo.App. 1095, 93 S.W.2d 1058 (1936). Those two cases involved factual situations in which the carrier discharged a passenger into a moving lane of traffic at a place not designated and marked as a regular boarding and alighting zone. The injuries resulted from being struck by a moving automobile and not from the condition of the premises. To some extent Feldotto v. St. Louis Public Service Co., 285 S.W.2d 30 (Mo.App.1955), has modified the literal application of *Lacks* and *Smuzynski* with respect to the liability of a carrier where the passenger is discharged into a moving traffic lane. The question of whether or not this court would hold that discharging a passenger into a moving traffic lane satisfied the carrier's obligation to provide a

3. See generally 5 Blashfield Automobile Law and Practice 440 § 221.7 and 611 § 234.8 (3d ed. 1966); 4 Blashfield Cyclopedia of Auto-

mobile Law and Practice 136 § 2172 (Perm. ed. 1946).

reasonably safe place to alight just because the passenger was not injured by reason of the terrain is recognized by the principal opinion as not necessary to the decision in this case and I agree with that observation.

It appears to me that Meyer v. St. Louis Public Service Co., 253 S.W.2d 525 (Mo. App.1952), cited in the principal opinion, and the instant case are somewhat factually analogous. Although the court in *Meyer* held that the carrier-passenger relationship had terminated, that holding was not the basis upon which recovery was ultimately denied. The court held that Meyer still held the status of an invitee of the St. Louis Public Service Co. at the time he was injured even though the St. Louis Public Service Co. was neither the owner nor occupant of the premises nor did it control those premises. The court said, loc. cit. at 530:

"In this case the defendant was neither owner, nor occupant of the premises on which the steps were built, nor could it be said that it had any control whatever over these steps. Nevertheless, we are of the opinion that its act of building the board barricade constituted an invitation to its passengers to use the steps, and, although not in control of the steps, used them for its own purposes and may be held liable to any passenger, using due care for his own safety, who is injured thereon by reason of its failure to warn him of any unsafe condition existing on said steps, known to it and not known to the passenger.

"In 48 C.J.S. pages 762 and 763, an invitation is defined to be the act, not only of requesting or bidding, but that of alluring or attracting and may include not only express invitation, but the invitation that may be implied from conduct. In 65 C.J.S., Negligence, § 43(3), page 510, we find the following: 'An invitation may be implied

from any state of facts on which it naturally and reasonably arises. An invitation may be implied from dedication, enticement, allurement or inducement to enter, * * * *and it may be manifested by the arrangement of the premises * * *.'* (Emphasis ours.)"

The court then went on to deny recovery to Meyer on the basis that Meyer's own testimony demonstrated that he knew that the steps were full of mud, dirt, and ice— the very condition which caused his fall— and consequently a warning would not have given him anymore information than he already had.

While the evidence does not show that Bi-State did maintenance work on this particular zone, it does show that Bi-State did undertake to keep asphalt boarding and alighting areas in proper condition, and the photographs of this loading zone show an arrangement of the premises whereby passengers are invited or induced to use the asphalt strip mentioned in the principal opinion in walking from the bus after they have alighted. High weeds were permitted to grow in the space between the asphalt strip and the regular sidewalk so that a passenger, in attempting to reach the sidewalk or street corner, is impliedly invited to use the asphalt strip and is channeled along the asphalt strip immediately upon alighting from the bus.

For the reasons set forth in Meyer v. St. Louis Public Service Co., *supra,* I believe that Bi-State was not, as a matter of law, relieved of all liability simply because plaintiff did not fall in the act of alighting. However, I concur in the result reached in the principal opinion because under *Meyer* and other Missouri cases the relationship of carrier-passenger, under the facts of this case, had terminated prior to plaintiff's fall.