Frank Kenneth GRAEFF, by his next
friend Kenneth S. Graeff,
Plaintiffs-Appellants-(Respondents),

v.

BAPTIST TEMPLE OF SPRINGFIELD,
Defendant-Respondent,

and

Emmett M. Davis, Defendant-Appellant.

No. 60507.

Supreme Court of Missouri,
En Banc.

Dec. 18, 1978.

**294**

Thomas G. Strong, Springfield, for plaintiffs-appellants-(respondents).

B. H. Clampett, Springfield, for defendant-respondent.

Gerald H. Lowther, Theodore L. Johnson III, C. Ronald Baird, Springfield, for defendant-appellant.

JOSEPH J. SIMEONE, Special Judge.

These are two appeals from the granting of a new trial by the circuit court of Greene County. Plaintiff Frank Kenneth Graeff[1], by his next friend and father, Kenneth S. Graeff, filed an action seeking damages for personal injuries in the circuit court of Greene County against the defendant-respondent Baptist Temple of Springfield and defendant-appellant Mr. Emmett M. Davis. The jury returned a verdict in favor of plaintiff, Frank (Frankie) Graeff, against Baptist Temple in the amount of $97,100, and returned a verdict in favor of defendant Emmett M. Davis. After motions for new trial filed by Baptist Temple and the plaintiff Frank Graeff, the court sustained the motions and granted a new trial "as to all parties on all issues." These are two appeals from that order granting a new trial. Plaintiff Graeff appeals the order granting a new trial to defendant Baptist Temple and defendant Emmett M. Davis appeals the order granting a new trial to the plaintiff. The appeals were originally taken to the Missouri Court of Appeals, Springfield District, but on recommendation of that court to consider an alleged per diem argument and the propriety of giving a converse instruction, we granted transfer of the cause before opinion because of the importance of these issues. Art. V, § 10, Mo.Const.

The petition for damages was filed on July 15, 1975, and trial commenced on August 16, 1976. Although there are different and sometimes contradictory versions of the facts, the jury could reasonably find the following.

Baptist Temple of Springfield is a corporation conducting religious services and educational activities. As a part of its operation it conducts schools and engages in programs which reach out to families and children. There are such things as Bible clubs and "gym days". Gym day is a day "where they get all the kids together and just have one . . . big Bible club . . . They'd have refreshments and games and a Bible story and possibly a film or something for them to see." Baptist Temple owned a number of church buses. One was number 40, a 1963 Chevrolet. The bus was equipped with directional lights, brake lights and flashing warning lights which could be activated by switches inside the bus. The bus also had a "stop arm."

---

1. Frank was born January 14, 1967, and was eight years old at the time of the accident—April 19, 1975.

In April, 1975 George Huntsman[2] was a student at Baptist Bible College and was employed by Baptist Temple part-time. Mr. Huntsman was primarily employed by Baptist Temple as a maintenance man— cleaning buildings, lawn care and running around for supplies. On some occasions he was called upon to drive the bus to pick up people for "gym day." On the day of the accident he picked up about 15–30 people, including the Graeffs—Frank, his two sisters and mother. Two young women, Janice Dodd and Cindy Payne also students directed him to the various homes. After "gym day" and on the return trip to the Graeff's home located at 2023 Taylor Avenue,[3] Huntsman drove South on Howard Street to Atlantic, east on Atlantic and then north on Taylor. There were 15 people on the bus on the return trip. All were children except Mrs. Graeff, Janice Dodd, Cindy Payne and Huntsman.[4] The bus proceeded south on Howard, east on Atlantic and north on Taylor to the Graeff home. As Huntsman turned north on Taylor no cars were parked on either side of the street.

When Huntsman turned north on Taylor and about two bus lengths from the Graeff home he saw in his left rear view mirror the Davis vehicle, a 1969 Ford station wagon "straddling the corner of Atlantic and Taylor, just turning onto Taylor." According to Huntsman, he was traveling between 15 and 20 miles per hour. Huntsman observed Davis when he was a bus length or two from the Graeff home. When Huntsman was about 70 feet south of the Graeff house he put his foot on the brake to "start slowing down to come to a stop." At this time Mr. Davis was about 30 feet from Atlantic or 225 feet from the Graeff home. Huntsman testified he turned on a switch which activated the flashing lights on the top of the bus which would alternate as long as the foot was on the brake.[5] He kept his foot on the brake. Huntsman heard the "clicking sound—louder than a turn signal." Huntsman never activated the stop-arm of the bus. Huntsman stopped the bus "even" with the Graeff driveway, but the left side of the bus was "two or three feet over the center [line] of Taylor." He estimated that he was two feet over the center line of Taylor so that some five to nine feet existed between the right side of the bus and the curb on Taylor Avenue.

When the bus stopped, Huntsman opened the door. The Davis vehicle was then "just at the tail end of my bus"—"He would have been just coming around the bus."[6] "After I'd seen him initially in the first spot, of course my intention was . . . to drive the bus down the street, and I didn't look again to glance until after the door was open. Then I seen he was coming around the left side." He admitted that he knew Davis was to the rear starting to pass him. He never informed the Graeffs that "There's a car coming behind us, . . ."

2. Mr. Huntsman was 21 years old at the time of the accident. He drove the bus despite a rule of the Temple that one had to be 25 years of age to do so. He did not receive any formal instructions concerning the operation of the bus, although he was given a road test. He had made "less than five" runs prior to the accident. Prior to coming to Springfield he had driven church buses on "church parking lots and around the church" where his father drove buses.

3. Taylor Avenue is 30 feet wide. The Graeff home was located 256 feet from Atlantic.

4. On the return trip towards the Graeff home Cindy got off at a previous stop and she was to meet Huntsman at the Graeff home. Huntsman was to wait for her.

5. There were several switches inside the bus which could be activated by the driver (1) a small lever when placed in upper position would turn on the top warning lights "as long as the brake is depressed", (2) a turn signal lever, (3) a larger switch which when the smaller switch was on could be used to activate the flashing warning lights even though the foot was not on the brake, and (4) a lever on the dashboard which operates the stop arm at the side of the bus.

6. "When I opened the door, its kind of an accordian door, so what I do when I stop, I'd use—if you open the door just as you are coming to a stop, it makes the door slide easier, so that would be my policy. When I come to a complete stop I use that to open the door and then, after the door is open, I look in the mirror and I see him comin' around."

or "honk[ed] the horn." When the bus stopped, Frankie was "back with his mother . . . somewhere behind me." He didn't know Frankie was off the bus until the collision with the Davis car. He saw Frankie take "two or three steps" before he and the car collided. Frankie seemed to be "moving briskly." At the time when Frankie collided with the Davis vehicle, he was 2–3 feet in front of and 3–5 feet west (left) of the bus. The collision took place "between the fender and front wheel" of the Davis vehicle. Huntsman saw that the boy's leg was broken between the knee and thigh, "and his bone [femur] was sticking through his pants and sticking out where you could see it." Frankie was screaming.

Emmett M. Davis, age 75 and retired, lived at 1102 E. Atlantic at the intersection of Atlantic and Howard. On the afternoon of April 19, 1975, he drove east on Atlantic and turned north on Taylor. "[W]hen I got to where I could look down Taylor" he saw the bus "sitting parked in front of the Graeff house on the east side of the street." No lights were on during the time he drove the 256 feet to the Graeff home. The stop-arm was not out. He saw no "flashing" lights or "brake lights." When Davis was about "two car" lengths or 40–50 feet behind the bus, he started to pull out to go around it. He sounded no horn. When he passed the bus he was going between five and ten miles per hour and "possibly" three or four feet to the left side. Davis never saw Frankie prior to the impact. The first time he saw the child was the "very instant" that he and the car "touched." According to Mr. Davis, Frankie ran into the side of the car "between the bumper and the front wheel." "He dashed out in front of the bus into the car."

Mrs. Linda Lee Graeff, the mother of Frankie, accompanied him and her two other children, Linda Yvonne, age 10, and Billie Jo, age 5 to gym day. She, her husband and family are members of the Baptist Temple. They attend regularly. Prior to the accident Frankie's leg was normal, he engaged in normal activities was "very active" and was in the second grade. He enjoyed boxing and swimming.[7] Because of mild retardation, Frankie was placed in special education. Mrs. Graeff and the children had taken the bus on other occasions but she did not recall "having to cross the street to get to the bus."

At the time of the accident, Mrs. Graeff stated "the next thing I knew, Frank was laying on the ground, screaming." Frankie was underneath Mr. Davis' vehicle at about the center post. "The center post [of the Davis vehicle] was right over the middle of Frank. Frank, from the waist down, was underneath Mr. Davis's car." Mrs. Graeff could see the "bone in his leg sticking out approximately, six inches."[8] Mrs. Graeff pulled him from underneath the car.

Several witnesses corroborated plaintiff's version of the accident.

Frankie received serious injuries in the collision. The hospital report indicated that he was admitted on April 19, 1975 and dismissed May 10—a total of 21 days. The report indicated that Frankie had received a compound fracture of the left femur— "The distal fragment is displaced medially and posteriorly and it is rotated laterally." "Adjacent soft tissues are severely lacerated." Frankie was operated on by Dr. Newt Wakeman, Jr., an orthopedic surgeon. Dr. Wakeman saw Frankie in the emergency room. "[H]e was a frightened youngster, . . . the most obvious injury was his left lower limb where there was a large laceration of approximately one half the

---

7. Mrs. Opal Stokkeboe, a neighbor, testified that she observed Frankie's physical activities. He played ball, he had a swing, he could run, he road a bicycle, etc. After the accident he used crutches. "He would just sit out in the yard." She also described the leg as "angry-looking."

Two witnesses for the plaintiff, Mr. James H. McManis and Mr. Bill Letterman told of Frankie's interest in certain physical activities. Mr.

McManis, a boxing coach told of Frankie's interest and activity in boxing before the accident. And Mr. Letterman, a student who lived with the Graeffs for a time told how they would "play around the house, scuffle a little bit." "He did like to box."

8. Mrs. Graeff testified that there was a black tire mark just above his ankle on his right leg.

circumference of his lower thigh with a bone protruding from the wound." He determined that an operation was necessary. Surgery was performed, a metallic pin was inserted in the tibia, the wound partially closed over the bone, and about half the wound was left open. Frankie was placed in traction from April 19 to May 10. On April 27, another operation was performed to close the wound. On May 10, Frankie underwent another operation for the removal of the pin and a body cast was applied. The cast covered all of the left limb, and the right limb to the knee. The upper cast encircled his body "up to approximately the level of his belly button."

After Frankie left the hospital Dr. Wakeman "saw" him fourteen times. The cast was removed, June 12, 1975. When the cast was removed there were some "raw areas" on the thigh and leg. The Doctor instructed Mrs. Graeff to change the dressing and keep the sores as clean as possible. After the cast was removed, crutches were required. At times the doctor had to surgically remove "dead tissue"—but it was not "very painful." By August "there was still one main area behind his knee that was still raw." Ultimately by April, 1976, Frankie had to return to the hospital to "take care of these open sores . . . ." Dr. Wakeman recommended Dr. Ernst Peter Danielsson, who recommended surgery. Frankie entered the hospital again on April 11, 1976.

Dr. Wakeman indicated that there would be permanent scarring of the leg, and that Frank will have to take precautions with the leg. "Certain occupations might be more hazardous to him than others," and he would have to be selective concerning employment "so as to try to protect the scar tissue there from breaking down and being irritated and being injured." The doctor estimated that he would "have approximately ten percent disability, and permanent physical impairment to the lower extremity."

Dr. Ernst Peter Danielsson, a plastic surgeon to whom Frankie had been referred testified at trial concerning the operations in April, 1976, a year after the accident.

He examined Frankie and admitted him to the hospital. He was confined from April 11, 1976 to April 30, 1976—20 days. "[T]here was heavy scarring which extended from the side of his lower thigh down into the back of the knee, . . . and extending down onto the back and the lateral aspect of the leg, . . . ." The Doctor recommended surgery. Two operations were performed—April 12 for a skin graft, and because of some drainage, a second operation was performed on April 23, 1976. Frankie was discharged on April 30, but instructions were given by the physician to care for the leg by "soaks." Dr. Danielsson too indicated that there would be permanent scarring; scar tissue "never is normal." The Doctor indicated that it is "quite possible" that he may need future surgery.

In the plaintiff's case, the life expectancy tables were introduced showing that a nine-year-old male child had a life expectancy of 64.89 years.

In the defendant-Baptist Temple's case, Mr. John E. Craig was the only witness. His profession is legal photography. At defense counsel's request he made a lineal plat of the vicinity of the Graeff home, 2023 North Taylor—beginning at the north curb line of Atlantic and continuing four hundred feet to the north. From the north curb line to the south side of the Graeff sidewalk the distance is 255 feet. From the curb line for 170 feet there is a .6 of 1% upgrade, then a plateau of 30 feet of level ground and then there is a decrease in elevation of 2%. From the 200 foot mark to the Graeff home the decline is fourteen inches. On cross-examination by plaintiff's counsel Mr. Craig was asked whether when he was "out there" with Baptist's counsel, did he "take bus number 40 and put it there across from the sidewalk . . . to see if it would stay stationary without putting the foot on the brake to hold it from rolling?" Without objection, Mr. Craig replied "As I told [Davis's counsel] I have never seen the bus, . . . ." Craig was also asked—"Did he take any vehicle out there and put it across from the sidewalk into the

Graeff home to see if you had to keep your foot on the brake to keep it from rolling down the hill?" Craig replied "No, sir, he did not." Craig admitted that the grade was such that if the driver "did in fact have his foot on the brake, regardless of whether anything on top of the bus was flashing" the bottom lights of the bus could be seen "as far back as Atlantic. . . ." On recross, the attorney for plaintiff queried Mr. Craig—"[W]ould you have any objection to taking a vehicle back out there and stopping it in front of 2023 [Taylor] to see if it would roll without your foot—." Counsel approached the bench, Baptist Temple objected and moved for a mistrial and the objection was sustained, but mistrial denied.

Trial of the case was held for five days. The above evidence was adduced. During the trial the following additional matters, which are in issue on these appeals occurred.

At the close of the evidence motions by defendants for directed verdicts were overruled. During the Instruction conference, the attorney for Baptist Temple indicated to the court:

"I think we moved at the beginning of the trial, Your Honor, to preclude or prohibit or avoid anything in the nature of

per diem argument, and I think the matter came up again, almost did if it didn't. We think it did in the opening statement.

"THE COURT: Per diem argument. That will have to be avoided.

\* \* \* \* \* \*

"[Plaintiff's counsel] We do not intend to argue per diem, but we do intend to argue along the line outlined in the opening statement, and we have, if there is— we have a case we would like for the Court to consider if there is any question about it.

"THE COURT: There is a question.

\* \* \* \* \* \*

"[Plaintiff's counsel] No, I'm not going to ask them to allow so-much a day while he was in the hospital, but I am going to suggest a total figure for the hospitalization range, very much as I did in the opening statement,[9] Your Honor, which is not as specific as was allowed in that case, but I'm not going to ask so-much a day for past or future, either one.

"THE COURT: All right, I will permit you to do that."

Instructions were then given to the jury. Among them were (1) Instruction No. 2— the verdict director against Baptist Temple[10], and (2) Instruction No. 3 [11]—the ver-

9. On opening statement plaintiff's counsel stated: "Then at the conclusion of this case, for Frankie's 40 days in the hospital we will ask you for a verdict to allocate $4,000 to $4,500. For 34 days in the cast we will ask you for $3,400 to $3,600, as you see in your wisdom. For the 413 days that that scar to date has opened and bled and been painful . . . we will ask eight to nine thousand dollars . . . The evidence will be that from today this boy has a life expectance of 64.89 years, 23,701 days . . . and for those 23,701 days, we ask $71,103. The total award we will ask for . . . is $86,503.00 . . . ."

10. "INSTRUCTION NO. 2

Your verdict must be for plaintiff Frank Graeff and against defendant Baptist Temple if you believe:

First, defendant Baptist Temple's bus driver either: failed to give an adequate and timely warning to defendant Davis that people were alighting from the bus or

opened the door and permitted plaintiff to leave the bus when the bus driver knew or by

the use of the highest degree of care could have known that defendant Davis was attempting to pass the bus, or

failed to warn plaintiff of the Davis vehicle when the bus driver knew or by the use of the highest degree of care could have known that defendant Davis was attempting to pass the bus, and

Second, the bus driver's conduct, in any one or more of the respects submitted in Paragraph First, was negligent, and

Third, such negligence either directly caused damage to plaintiff or combined with the acts of defendant Davis to directly cause damage to plaintiff, unless you believe plaintiff, is not entitled to recover by reason of Instruction No. 4. MAI 17.11, 17.02 and 19.01 modified. Offered by plaintiff."

11. "INSTRUCTION NO. 3

Your verdict must be for plaintiff Frank Graeff and against defendant Emmett Davis if you believe:

First, defendant Davis either:

dict director against Emmett Davis and (3) Instruction No. 5 [12]—a converse offered by defendant Davis.

During the opening portion of plaintiff's argument, the plaintiff's attorney argued the following:

"All right, what are those damages, . . .. This boy was in the hospital for 40 days and we think, and we suggest this, for this 40 days in the hospital, we think $4,000 to $4,500 is a modest sum for the kind of agony Frankie underwent with five operations . . .. Now, after he came home from the hospital he was in a cast . . .. And for that period of time, being in that cast for 34 days, we say somewhere in the range of $3,400 to $3,600 is a modest sum . . .. Then excluding all this up to the present time, 413 days have elapsed, and in that period of time this is the way Frankie's leg has looked, . . .. For those to the present time, 413 days, we say eight to nine thousand dollars is a modest sum.

What about the future? . . . You can see the way he has to take care of his leg when he has done nothing but sit in the courtroom. Your verdict must be for life and for the future, these 23,701 days [64.89 years] we think a fair amount would be $71,103 to $80,000, and either column you use (writing on large paper before the jury)—it ranges from $86,503 to $97,100, and we say that this is a small amount for a lifetime of injury."

During the closing argument of the counsel for Baptist Temple, it was stated:

"And the testimony in this case is unquestioned that when the foot is on the brake the two stop lights and the tail

lights operate, regardless of whether the little switch is on, because the little switch only had the effect of causing the alternating lights to operate at the same time these three were operating.

"Now, I believe that the jury will sincerely recognize that this man had had his foot on the brake in stopping. He had to do that and certainly with the slope of that street being what it was, . . . he would have continued to have his foot on the brake at the time he says Mr. Davis went around the vehicle.

"Therefore, there was warning to Mr. Davis, if he had been watching. . . ."

After the argument of counsel for Baptist Temple, counsel for Emmett Davis argued:

"Now, who is the party that brought all of the evidence that they could find to you? Who brought all of the evidence that they could find here? Everybody that was around the scene or knew anything about the boy? It was Mr. Davis. It wasn't the plaintiff. It wasn't the Baptist Temple. All they did was put somebody [Mr. Craig] that had gone out there to make a plat. They could hire a guy to go out there and make a plat and shoot the elevations and measure all this kind of stuff, but they couldn't take the bus out there to see if it would roll. All they want to tell you is 'Why, I'll bet you it will roll down the hill.'

. . . . .

"They didn't do that. They could have taken a bus out there ten minutes and

---

failed to sound his horn as he started to pass the bus,

or

passed the bus after he knew or by using the highest degree of care could have known that children might alight from the bus and cross the street in front of him, and

Second, defendant Davis' conduct, in either or both of the respects submitted in Paragraph First, was negligent, and

Third, such negligence either directly caused damage to plaintiff or combined with the acts of the bus driver to directly cause damage to plaintiff, unless you believe plaintiff is not enti-

tled to recover by reason of Instruction Number 4.

MAI 17.02, 17.04, 17.07 and 19.01 modified. Offered by plaintiff."

12. "INSTRUCTION NO. 5

Your verdict must be for Defendant Emmett Davis unless you believe that Defendant Emmett Davis' conduct was negligent as submitted in Instruction No. 3. MAI 33.04(1) Submitted by Defendant Davis." The court also gave withdrawal instructions with reference to "school bus" and the fact that Huntsman had no chauffeur's license.

told you, and I guarantee you that if there was enough grade that it could have rolled, they'd have had it out there. They'd have a man in here telling you all about it, because if they want to go to all the time and expense to make that drawing right there, I'll guarantee you they thought of it and they'd have had him in here, but there is not enough of a grade there to make a whit of difference."

Objections were made to the above arguments.

After the instructions and arguments, the jury retired and returned a verdict in favor of the plaintiff, and against Baptist Temple in the amount of $97,100. The jury also found in favor of the defendant, Emmett Davis.

After motions for new trial were filed by the plaintiff and Baptist Temple, the court, on November 24, 1976, ordered a new trial as to all parties on all issues because of "error in Instruction No. 2, Instruction No. 5, and due to prejudicial argument."

In a memorandum opinion supporting the order granting a new trial, the trial court held that (1) it could not agree with the Temple's argument that the plaintiff, being in the custody of his mother, is precluded from recovering; (2) although the court consented to the plaintiff's argument concerning damages, "[w]e are deeply concerned about this argument . . . " but "[t]here is no question that plaintiff has cited . . . a case wherein the argument seems to follow that of plaintiff;" (3) as to the argument of Davis about "missing witnesses" "we do not think that such final argument is subject to the same amount of criticism as one where comment is made about a missing witness, but it is probably improper argument." "Davis' attorney did not limit himself to that argument, but argued that the Church could have taken the bus out to the scene to see if it would roll. We assume that since the bus belonged to defendant church, defendant Davis did not have equal access to it." But, "[i]t seems clear to the court that the avail-

ability of making a test with 'a bus' and calling a witness to testify about the same was as available to defendant Davis as it was to the Church;" (4) "While the arguments made in and of themselves might not be reversible error, we are of the opinion that, when taken as a whole, the defendant Church has grounds to claim that they were prejudiced by the closing arguments by the plaintiff and by the defendant Davis"; (5) as to the excessiveness of the verdict, "we would not reverse the decision because of the excessiveness of the verdict;" (6) as to Instruction No. 2, and particularly as to the charge of "failing to warn plaintiff of the Davis vehicle *when* the bus driver knew or by the use of the highest degree of care, etc." the word "when" can mean at a particular instant or a span of five minutes. There is no "in time thereafter" type of admonition to the jury to protect Baptist Temple from being charged with a higher degree of care than applies under the law and (7) with reference to plaintiff's motion for new trial against Davis, Instruction No. 5 is erroneous because it fails to specifically converse the acts of negligence set forth in Instruction No. 3.[13]

From that order, the plaintiff, Frank Graeff and Emmett Davis appealed.

On this appeal, plaintiff-Graeff makes several points: (1) he contends that the court erred in granting a new trial to Baptist Temple on the issue of plaintiff's argument concerning damages because (a) the argument of plaintiff's counsel was in accordance with *Ricketts v. Kansas City Stock Yards of Maine*, 537 S.W.2d 613 (Mo.App. 1976), (b) such argument did not contain any mathematical formula, (c) the jury's verdict does not reflect that a per diem formula was used, and (d) error in the argument, if any, was harmless because the verdict was not excessive and found by the court to be so. He also contends: (2) that the court erred because the argument of counsel for Davis was (a) a legitimate comment on the failure of Baptist Temple to produce evidence in view of the testimony

---

**13.** In the motion for new trial plaintiff relies on Notes on Use to MAI 33.04 and *Davis v. St.* *Louis Southwestern Railroad Co.*, 444 S.W.2d 485 (Mo.1969).

of Mr. Craig, (b) not prejudicial because the fact of a slight grade in the street did not prove or disprove the necessity of applying the brakes, and the comment was precipitated by counsel for the Temple, and (c) not prejudicial error, if error at all; (3) as to Instruction No. 2, the plaintiff's verdict director against Baptist Temple, plaintiff contends that an "in time thereafter" clause was unnecessary because (a) such an admonition is used only to establish a "duty to act" when it becomes apparent that a collision would otherwise result, but here a duty to act arose when the bus was stopped, (b) the evidence placed the Davis vehicle at the left rear corner of the bus at a time when the door was opened so that the instruction was of sufficient clarity to avoid a roving commission and (c) the "in time thereafter" clause is required only when an instruction is patterned after MAI 17.04 and (d) the point was not preserved.

Baptist Temple on the other hand contends that the court did not err because (1) the plaintiff's argument on damages was a "mathematical formula" argument, (2) the argument by Davis counsel was a prejudicial "missing witness" argument, (3) Instruction No. 2 was erroneous because it was not supported by the evidence and gave the jury a roving commission. The Temple also contends (1) that the plaintiff failed to make a submissible case since plaintiff was accompanied by his mother and was in her care and custody so that no special duties were imposed upon the driver of the bus and hence there was no actionable negligence,[14] (2) the verdict was excessive and (3) that certain cumulative references were made throughout the trial that the bus was a "school bus", that Huntsman had no chauffeur's license and that various color photographs and items were introduced.

Appellant, Emmett Davis, contends that the trial court erred in granting a new trial to plaintiff because (1) the converse instruction, No. 5, was a general converse of the second paragraph of plaintiff's verdict di-

rector (No. 3) and did not need to converse all the elements of the first paragraph in such instruction, and (2) a directed verdict should have been sustained (a) since Davis had no duty to sound a horn as he passed the bus or (b) the failure to sound a horn was not the proximate cause of the injuries, or (c) Davis was not prohibited from passing the bus where there was no appearance of or warning that passengers would be getting off the bus.

In reply to appellant Davis' contention that the court did not err, plaintiff contends that (1) the converse instruction, No. 5 violated *Davis v. St. Louis Southwestern Railroad Co.*, supra, deviated from the Notes on Use to MAI 33.02 and 33.04 and misdirected the jury by allowing it to find against plaintiff unless plaintiff proved each and every act of negligence contained in Instruction No. 3, and (2) the court did not err in refusing to grant a directed verdict to Davis because the judicial decisions impose a duty upon Davis to stop or sound a warning when he knows or should know that a pedestrian "might" cross the street in front of him even when his view is blocked, and because under the evidence Davis should have realized Frankie "might" emerge from behind the bus when the bus stopped over the center line and the exit door was in plain view.

### The "Per Diem" Argument

The first issue which we must resolve is the validity of the plaintiff's arguments concerning "per diem."

 One of the most difficult decisions facing the jury in a personal injury action is to decide the amount of monetary award, if any, that the plaintiff is entitled to be awarded as compensation for past, present and future pain and suffering. The measure of damages for pain and suffering in this state is and has been what is fair and reasonable. The jury is so instructed by

---

**14.** In reply, the plaintiff urges that the driver is required to provide a safe place to alight and that the contention of the Temple that since Frankie was in the care of his mother absolves

defendant of any negligence is without merit since her negligence cannot be imputed to Frankie.

MAI. There is no fixed measure, table or standard which the jury can use as an accurate index to establish an award of damages. No method is available to the jury by which it can objectively evaluate such damages, and no witness may express his subjective opinion concerning the matter. "From time immemorial, the judicial measure of damages for pain and suffering has been fair and reasonable compensation . . . because there is and can be no established standard, fixed basis, or mathematical rule by which such damages may be calculated." *Faught v. Washam*, 329 S.W.2d 588, 602 (Mo.1959). In a very real sense, the jury is required to evaluate in terms of monetary compensation the injuries and pain and suffering sustained. In guiding the jury in this difficult task, the courts, including those in this state, permit counsel to suggest a "lump sum", and the "mere argumentative suggestion" of a lump sum is not error. It is proper to inform the jury of the total amount of damages sought and this technique does not seem to be questioned. *Faught*, 329 S.W.2d at 602 and cases cited therein; annot., 14 A.L.R.3d 541, 541 (1967).

The controversy which has raged over the past several decades has been the propriety of the so-called "per diem" argument made by plaintiff's counsel to the jury.

The "pure" "per diem" argument discussed in the numerous judicial decisions reduces the physical and mental suffering down into units of years, days, hours or minutes, and then sets a value on each such unit. Each unit is multiplied by the total number of such units which gives a total value of compensation.

There are, however, other aspects of such arguments on pain and suffering which are strictly not "pure" per diem computations. They range from the "lump sum" approach to a "job offer." See *e. g., Ricketts v. Kansas City Stock Yards of Maine, supra; McCormick v. Smith*, 459 S.W.2d 272, 278

(Mo.1970); *Kometani v. Heath*, 50 Hawaii 89, 431 P.2d 931, 938 (1967)—lump sums for various injuries; *Beagle v. Vasold*, 65 Cal.2d 166, 53 Cal.Rptr. 129, 139, 417 P.2d 673, 683 (1966) (Traynor, C. J., concurring and dissenting) and *Faught*, supra.

The "pure" per diem argument—whether an attorney may argue to the jury that his client's damages for pain and suffering may be measured in terms of dollars for a specific unit of time has been debated and discussed for years. Few issues have evoked more controversy. There is no unanimity among the states.[15] Of the 36 states which have passed upon the issue, 25 allow the per diem argument and 11 have ruled that it may not be used. The weight of authority favors the use of such an argument.

*Botta v. Brunner*, 26 N.J. 82, 138 A.2d 713, 60 A.L.R.2d 1331 (1958) is the leading decision prohibiting such an argument. In *Botta*, the Supreme Court of New Jersey upheld the trial court's refusal to allow plaintiff's attorney to suggest that the client's damages for pain and suffering be measured by units. Such statements are not evidence and such statements substitute unproven, speculative and fanciful standards of evaluation for evidence. Such argument instills in the minds of the jurors impressions, figures and amounts not in evidence. Such valuations have no foundation in the evidence. "In the final analysis, . . . [such] suggestions . . . constitute an unwarranted intrusion into the domain of the jury. . . . 'Jurors know the nature of the pain, embarrassment and inconvenience, and they also know the nature of money. . . .'" *Botta*, 138 A.2d at 725, 60 A.L.R.2d at 1345–1346.

The reasons for the principle prohibiting the use of such an argument have been summarized in *Ratner v. Arrington, supra*, 111 So.2d at 88: (1) there is no evidentiary basis for converting pain and suffering into

---

**15.** See among other decisions and articles the following: Note: 1962 U.Ill.L.Forum, 269, annot., 60 A.L.R.2d 1347 (1958) and Supp.; cases collected in *Faught*, 329 S.W.2d at 603; *DeMaris v. Whittier*, 280 Or. 25, 569 P.2d 605, 608 (1977); *Beagle v. Vasold*, 53 Cal.Rptr. at 132–133, 417 P.2d at 676–677; 21 ATLA L.Rep. 104 (April, 1978); *Ratner v. Arrington*, 111 So.2d 82, 88 (Fla.App.1959); Cooper, The Role of the Per Diem Argument in Personal Injury Suits, 5 Duquesne L.Rev. 393 (1967).

monetary terms, (2) suggesting a formula amounts to the attorney giving testimony, (3) juries are misled into making excessive awards, (4) following such argument the defendant is placed in a difficult position.

Authorities favoring the use of such arguments also give numerous reasons: (1) it is necessary that the jury be guided by some practical considerations, (2) the jury should not be required to make a blind guess as to damages, (3) the argument that the evidence fails to provide a foundation for per diem suggestion is unconvincing, because the jury must, by that or some other reasoning process, estimate an amount tailored to the evidence, (4) the claimed danger of such a suggestion is an exaggeration and such danger may be dispelled by the court's instructions.

The leading case in Missouri is *Faught v. Washam, supra.* There a division of this court in a wide ranging opinion held that a "job offer" [16] per diem argument was improper. Recognizing a "sharp cleavage" among the decisions, it was held that the "considerations advanced by the authorities disapproving the mathematical formula argument are more persuasive."

> "Whatever may be the cold logic or academic theory of the matter, the ungilded reality is that such argument is calculated and designed to implant in the juror's minds definite figures and amounts not theretofore in the record . . . and to influence the jurors to adopt those figures and amounts in evaluating pain and suffering and in admeasuring damages therefor." *Faught,* 329 S.W.2d at 603.

The court agreed with *Botta.* While much "emotional reasoning can be advanced for the thesis proposed in behalf of injured plaintiffs. . . . ", "equal opportunity in the trial of cases for the contending parties to offer their proof and submit their arguments . . . ." cannot justify a mathematical formula agreement.

Through the years *Faught* has been followed in Missouri although our research discloses that no case has been reversed because of such an argument.[17] In *Ricketts,* plaintiff's counsel made an argument similar to the one at bar—suggesting a certain amount for days of hospitalization, a certain amount for pain and suffering following hospitalization and a certain amount for future pain. The Kansas City District, in effect, held that such argument did not come within the proscription of *Faught* because (1) the plaintiff did not refer to any per day or per hour amount but simply suggested a "lump sum" for the specific periods, and (2) the argument did not affect the size of the verdict nor cause it to be excessive because the amount requested was not accepted by the jury.

■ Plaintiff-Graeff places great reliance on *Ricketts.* We agree with *Ricketts.* The argument here is similar to *Ricketts* and *McCormick* which we approve. The posture in which the plaintiff's counsel in this case offered the figures is such that he did not refer to any per day or per hour amount but merely suggested a lump sum for the specific periods of hospitalization, the time in the cast, the pain and suffering for the period from injury to trial, and for future life expectancy. The argument was not broken down into minutes, hours or days. There was no "job offer" argument as in *Faught.* Furthermore, there is a specific finding by the trial court that the verdict was not excessive. *Chambers, supra.*

We therefore conclude on this point that the argument of counsel for plaintiff was not within the limitations and objections of *Faught.*

We are not persuaded that because the jury reached a verdict identical to the maximum amount suggested by plaintiff's coun-

---

**16.** " 'I want to offer you a job and I want to tell you a little bit about this job . . . . [Y]ou only get paid $3.00 [per] day. Here is your job—your job is to suffer Mr. Faught's disability." *Faught,* 329 S.W.2d at 602.

**17.** See *McCormick v. Smith,* 459 S.W.2d 272 (Mo.1970); *Chambers v. Kansas City,* 446 S.W.2d 833 (Mo.1969); *Goldstein v. Fendelman,* 336 S.W.2d 661 (Mo.1960); and *Wimsatt v. Mitchell,* 383 S.W.2d 154 (Mo.App.1964).

sel, that such an argument is to be condemned. *Faught* stated the "proof of the pudding is in the eating," by referring to *Braddock v. Seaboard Air Line R. Co.*, 80 So.2d 662 (Fla.1955), aff'd. 96 So.2d 127 (Fla. banc 1957) when the jury returned a verdict in the exact amount requested. But despite such isolated instances there can be little doubt that in the vast majority of cases the jury does not follow counsel's suggestions. *Cf. Beagle*, 53 Cal.2d at 136, 417 P.2d at 680. Such an argument places little faith in the jury. The jury is still bound by the court's instructions and is presumed to do its duty and award damages that are just and reasonable. We therefore rule this point against respondent Temple and conclude that the trial court erred in finding the argument of plaintiff's counsel prejudicial.

### The Converse Instruction

The trial court held Instruction No. 5—Davis' converse instruction—erroneous because it failed to specifically converse the acts of negligence set forth in the plaintiff's verdict director in Instruction No. 3, and awarded plaintiff a new trial as against Davis on that ground. Davis contends on appeal that the court erred because Instruction No. 5 was a general converse of the second paragraph of Instruction No. 3 and was patterned after MAI 33.04(1) and thus it was not necessary to converse all the elements in the first paragraph of the verdict director. Plaintiff relies, in support of the trial court's actions, on *Davis v. St. Louis Southwestern Railroad, supra* and contends that the instruction deviated from MAI Notes on Use to MAI 33.02 and 33.04, hence the trial court did not err in granting to plaintiff a new trial against defendant Davis.

■ The issue which we must determine therefore is whether a converse instruction which converses the negligence submission of a verdict director which contains several disjunctive submissions must also converse

each disjunctive submission. Or to put the issue another way—where the defendant elects to converse the second paragraph (negligence submission) of a verdict director, must the converse specifically converse each of the disjunctive submissions in the verdict director?

In *Davis*, plaintiff brought an action for personal injury under the Federal Employers' Liability Act. Verdict was for the defendant but the trial court sustained a motion for new trial. Plaintiff's verdict director instructed the jury that verdict should be for plaintiff if (1) the defendant failed to provide reasonably safe methods of work, or (2) defendant's employee other than plaintiff dropped a brake beam on a hammer handle and (3) defendant in respect to (1) was negligent or the employee with the respect to (2) was negligent. The defendant's converse instruction merely stated: "Your verdict must be for the defendant if you do not believe that defendant was negligent." The converse instruction was held to be erroneous and the granting of a new trial was affirmed.

In *Davis*, the verdict director submitted the negligence of two different entities—the corporation and a fellow employee. The negligence paragraph in *Davis* (paragraph third) submitted two negligence standards in the alternative, *i. e.*, one for the employer and one for the employee. The defendant in *Davis* used an "if you do not believe" converse, MAI 33.02(2)—"Your verdict must be for [the] defendant if you do not believe that defendant was negligent." Such an instruction was clearly erroneous because it was a misdirection and conversed only the negligence of the employer and did not refer to the negligence standard of the employee. *Davis* relied upon the Caution in the Notes on Use to MAI 33.02.[18]

*Davis* seems to require and implies that a defendant who converses the negligence paragraph of the verdict director containing disjunctive acts of negligence must also

---

18. "Caution: This form, using the introduction 'if you do not believe' is *not* suitable for conversing multiple negligent acts submitted in the disjunctive. For such converse instructions use the form similar to Converse Instruction 33.04(5)."

converse *all* disjunctive specifications.[19] In this regard the implication is unfortunate and does not accord with MAI 33.04. The cautionary note to MAI 33.04 is applicable when the defendant elects to converse some or all of the disjunctive submissions; it is not applicable to a situation as here when the defendant elects to converse only the negligence paragraph of the verdict director. The *Davis* opinion was not erroneous because the negligence paragraph in the verdict director contained disjunctive negligence submissions. *Davis* therefore must be limited to its peculiar facts.

MAI 33.04 contains five "unless you believe" converse instructions. MAI 33.04(1) and (4) converse the negligence paragraph of a disjunctive verdict director without conversing the disjunctive submissions of the verdict director. But MAI 33.04(5) converses several disjunctive submissions with an "unless you believe" clause. If the defendant elects to converse some aspect of or all of the disjunctive submissions he is then required to converse all disjunctive submissions. However, if he elects to converse only the general negligence submission, there is no requirement in MAI 33.04(1) or 33.04(4) to converse the disjunctive submissions in the verdict director.

*Davis* is distinguishable and does not govern this case. *Davis* is not applicable to the situation here so as to invalidate a converse instruction by the defendant who elected to converse only the second paragraph of the verdict director (the negligence submission) and who did not converse the disjunctive submissions of negligence.[20] Here, Instruction No. 3 informed the jury in paragraph second, that defendant Davis' conduct was negligent in either or both respects submitted in Paragraph First and the converse instruction, following MAI 33.04(1), con-

versed paragraph second of the verdict director, and specifically referred the jury to the plaintiff's verdict director. It was not, as in *Davis,* a misdirection, nor was it misleading.[21]

We therefore hold that in electing to converse the general negligence paragraph of the verdict director the defendant Davis was not required to converse the disjunctive submissions in the verdict director.

We rule this point against the plaintiff. The trial court erred in granting a new trial to the plaintiff as against Davis on this ground.

### Davis' Closing Argument

■ During the course of the trial Mr. John Craig testified on behalf of Baptist Temple relating to the grade of the area in the vicinity of the Graeff home. At the scene there was a 2% sloping grade. During the argument of counsel for Baptist Temple counsel stated that it is apparent that the lights were on the bus and then said:

> "Now I believe that the jury will sincerely recognize that this man [Huntsman] had had his foot on the brake in stopping. He had to do that and certainly with the slope of that street being what it was, . . . he would have continued to have his foot on the brake at the time he says Mr. Davis went around the vehicle."

Counsel for Davis then argued that "they" could have taken a bus out there and if there was enough grade that it could have rolled, "they'd" have had it out there. "They'd" have a man here telling you all about it. The trial court referred to this argument as a "missing witness" argument, found that it was not subject to the same criticism as a missing witness argument but

---

**19.** "In our view that is exactly what was wrong with it [the converse] because the MAI directions clearly mean that multiple negligent acts cannot be conversed in such a general cryptic way but instead require that all theories of negligence submitted in the disjunctive must be designated and conversed specifically." *Davis,* 444 S.W.2d at 489.

**20.** Plaintiff contends that the converse was not in substantially the same language used in the verdict directing instruction being conversed. But the converse was in the form authorized by MAI 33.04(1).

**21.** See generally, the discussion in Thomas, Converse Instructions Under MAI, 42 Mo.L. Rev. 175, 188–190 (1977).

was "probably" improper; and while the arguments made might not be reversible error, that taken as a whole the church had grounds to claim prejudice.

Under the circumstances we believe that the argument by Davis' counsel was not error.

The context in which this issue arises is in reality not a comment on the failure of Baptist Temple to produce evidence favorable to it or a comment on the failure to produce a missing witness who is equally available. Rather the comment was one in reply to refute the comment by counsel for the Temple relating to the slope of the grade so as to require Huntsman to keep his foot on the brake. The comment was made to refute the statement that the foot was on the brake and the implication that lights were on. The comment was not prejudicial. The trial court itself believed that no reversible error in this regard took place but thought when "taken as a whole" the church had grounds to claim prejudice. The comment was a retaliatory argument.

 Even if this argument could be considered as one on the failure of a party to produce evidence or a witness, the comment was within the principles relating to the non-production of evidence or a witness. The failure of a party to produce or suppress evidence which is peculiarly within his knowledge or under his control and which he would naturally be expected to produce if favorable to him gives rise to a legitimate inference that its production would have resulted unfavorably to him and entitles counsel for the opposing party to comment on a failure to produce evidence. *White v. Metropolitan Life Ins. Co.,* 218 S.W.2d 795, 801 (Mo.App.1949); *Cooper v. Metropolitan Life Ins. Co.,* 94 S.W.2d 1070, 1072 (Mo.App. 1936). The principle is also applicable to the failure to call a witness who is not equally available to each party. But a lack of availability depends upon a relationship between a party and a witness who would reasonably make the witness favor one party against the other. *Hawkins v. Allen Cab Company,* 457 S.W.2d 940, 942 (Mo.App. 1970). For a witness to be available to one party there must have been a community of interest between that party and the witness, or the party must have had so superior an opportunity for knowledge as in ordinary experience would have made it reasonably probable that the witness would have been called to testify except for the fact that his testimony would have been damaging. *Cooper,* 94 S.W.2d at 1073.[23]

The word "available" within this rule does not mean merely available for service of process but depends on the party's superior means of knowledge of the existence and identity of the witness, the nature of testimony that the witness would be expected to give and any relation to the party so as to make it natural that he will be expected to testify in favor of one. *Adam Hat Stores v. Kansas City,* 307 S.W.2d 36 (Mo. App.1957), trfd. 316 S.W.2d 594 (Mo. banc 1958).

Here, the trial court recognized that since the bus belonged to the Temple, Davis did not have equal access to it. A witness to determine whether the bus would roll would reasonably favor the Temple. *Cf. Caffey v. St. Louis-San Francisco Railway Company,* 292 S.W.2d 611 (Mo.App.1956).

We are informed in the briefs that Mr. Craig was not divulged as a witness, despite interrogatories, until the beginning of the trial. Under the circumstances, there was little time then for Davis or the plaintiff to test the slope of the street to determine if the bus would roll. The argument did not materially affect the merits of the action. There was no evidence that the slope was of such a magnitude that a bus would or

---

**23.** There have been many instances where comments have been held to be proper for the failure to produce evidence or a witness. *St. Louis County v. Szombathy,* 497 S.W.2d 144, 147 (Mo.1973); *Redick v. M. B. Thomas Auto Sales,* 364 Mo. 1174, 273 S.W.2d 228, 237 (1954); *Hoffman v. St. Louis Public Service Co.,* 255 S.W.2d 736, 743 (Mo.1953); *Bobos v. Krey Packing Co.,* 323 Mo. 224, 19 S.W.2d 630, 634 (Mo. banc 1929); *White v. Metropolitan Life Ins. Co.,* 218 S.W.2d at 799; and *Deaver v. St. Louis Public Service Co.,* 199 S.W.2d 83, 85 (Mo.App.1947).

would not roll. There was no detailed evidence concerning mechanisms which would have kept the bus from rolling and no evidence that Huntsman left his foot on the brake to keep the bus from rolling.

■ In any event we believe that under these circumstances the argument was not error, or if error was not prejudicial either singly or in combination with other arguments. In determining whether an argument of counsel referring to a failure to produce certain evidence is prejudicial, the courts hold that a liberal attitude is permitted in their deductions from the evidence. *City of Kennett v. Katz Const. Co.*, 273 Mo. 279, 202 S.W. 558, 562 (Mo.1918).

*Instruction No. 2—"In Time Thereafter"*

■ The trial court determined that Instruction No. 2—plaintiff's verdict director—and particularly the charge that Huntsman "failed to warn plaintiff of the Davis vehicle *when* the bus driver knew or by the use of the highest degree of care could have known that defendant Davis was attempting to pass the bus, . . ." was erroneous because "when" can mean at a particular instant or a span of five minutes. The court held that there was no admonition of an "in time thereafter" to protect the Temple from being charged with a higher degree of care than applies under the law.

We believe that the instruction was not erroneous and confined the jury to the facts in evidence and that the charge that Huntsman failed to warn plaintiff of the Davis vehicle "when" the bus driver knew or could have known that Davis was attempting to pass did not give the jury a roving commission or impose a duty on the Temple from being charged with a higher degree of care than the law requires.

■■ The instruction was not erroneous for several reasons. First, unlike the intersectional collision cases,[24] here the driver of the bus had a duty to discharge a passenger, and especially a child, at a safe point. *Feldotto v. St. Louis Public Service Company*, 285 S.W.2d 30, 32 (Mo.App.1955). It is well established that a carrier[25] is required to exercise the highest degree of care to avoid injury to passengers alighting from its vehicle and that such duty continues at least until the passenger has left the vehicle and is on the ground in safety. The question which arises in some cases is whether the passenger-carrier relationship and the duties incident thereto continue thereafter. *See Lieser v. Bi-State Development Agency, Etc.*, 509 S.W.2d 53, 55 (Mo. banc 1974).

■ The duty of a carrier to provide a reasonably safe place to alight and the duty after alighting has been the subject of many decisions. There are several well recognized principles. *Feldotto*, 285 S.W.2d at 32–33. The carrier is under a duty and obligation to safeguard passengers to select a reasonably safe place to discharge passengers and the carrier is not absolved from this duty merely because the passenger is not injured in the very act of alighting or at the very spot or moment where and when he alighted. *Lieser v. Bi-State*, 509 S.W.2d at 57; *Feldotto*, 285 S.W.2d at 32; *Gott v. Kansas City Rys. Co.*, 222 S.W. 827, 830 (Mo.1920). And if the passenger is put off at an unsafe place and is injured in consequence, the negligence of the carrier is considered the proximate cause of the injury. *Gott*, 222 S.W. at 830. This case is unlike the situations in *Lieser* or *Smuzynski v. East St. Louis Ry. Co.*, 230 Mo.App. 1095, 93 S.W.2d 1058 (1936).

■ Here all the evidence indicated that Huntsman stopped the bus over the center line of Taylor and five to nine feet from the

---

**24.** See *Greenwood v. Bridgeways, Inc.*, 243 S.W.2d 111, 114 (Mo.App.1951); *Stakelback v. Neff*, 13 S.W.2d 575, 577 (Mo.App.1929)—breach of duty or failure to act must arise after the defendant has actual or imputed knowledge that his failure to do some act would be likely to produce an injury to the plaintiff.

**25.** None of the parties analyze the question whether the Temple in operating its bus was a carrier. The briefs assume so.

east curb of Taylor. There was evidence that at the prior stop the children who alighted crossed in front of the bus, there was evidence that Huntsman saw Davis' vehicle down Taylor and at a time when he was at the tail of the bus. Under such circumstances the duty of the defendant arose when the bus stopped at a time when the child was still on the bus and the door was opened. The duty arose when the bus stopped to permit the child to disembark and not, as in the intersectional collision cases, at a time when the exercise of due care would leave the driver to believe that a collision would occur so as to require an "in time thereafter" admonition in MAI 17.04. The opening of the door was more than an invitation to alight but was an assurance that plaintiff could alight with safety. *Feldotto,* 285 S.W.2d at 32.

Secondly, Instruction No. 2 was not erroneous because under the evidence in this case the jury was not given a roving commission. Huntsman saw the Davis vehicle when it turned onto Taylor and as it began to pass the bus; Huntsman saw the vehicle at the tail end of the bus—the left rear corner. At the time he stopped the bus, Huntsman knew that Davis was to the rear and was starting to pass. The term "when" was related to the facts and circumstances established by the evidence. The instruction informed the jury that such negligence caused or contributed to cause injury to plaintiff. In view of the facts disclosed in the evidence and the limitations in the instruction, the instruction was sufficient.

Third, there was no requirement to use an MAI 17.04 format—that the defendant knew or by the use of the highest degree of care could have known there was a reasonably likelihood of collision "in time thereafter" to have acted.

Contrary to the Temple's position the submissions that the bus driver failed to give a warning to Davis that people were alighting, or that the driver permitted plaintiff to leave the bus or failed to warn him of the Davis vehicle were all supported by the evidence. Davis testified that there was no warning and there was evidence

that the Davis vehicle was at the tail of the bus and moving in the passing lane at the time the bus driver opened the door.

Under all the circumstances the instruction was not erroneous in the form given and under the facts adduced.

### The Issue of the Care and Custody of the Mother

Baptist Temple places emphasis on the fact that Frankie was in the care and custody of his mother so that no special duty was imposed on the Temple hence there was no actionable negligence on the part of the bus driver Huntsman in permitting Frankie to alight from the bus. The Temple contends that the court erred in refusing to direct a verdict in its favor. The Temple relies on 13 C.J.S. Carriers § 694, p. 1291 (1939) to the effect that the primary duty of caring for such child is on the parents who have custody and where the child is in the care of his parents, the carrier has the right to rely on the presumption that the parent will take such care as the natural love of the parent would prompt him to exercise under the circumstance.

The Temple relies on a number of decisions which quote or refer to the general principle in 13 C.J.S. Carriers § 694, p. 1291: *Norfolk & W. Ry. Co. v. Estepp,* 204 F.2d 880 (6th Cir. 1953); *Burnett v. Wilder,* 507 S.W.2d 449 (Ky.App.1974); *White v. Chappell,* 219 N.C. 652, 14 S.E.2d 843 (1941); and *Shay v. Parkhurst,* 38 Wash.2d 341, 229 P.2d 510 (1951).

These cases are not dispositive of the issue here. In *Burnett,* after the bus driver left the bus the father of the deceased left the bus to see about a young son, and the deceased son left the bus thereafter and was killed. The failure of the defendant to give instructions to the father to care for his children was not negligent. In *Norfolk,* a young boy who was in the car of his foster mother was found missing from a train. Under the circumstances, it was held that defendant was entitled to a directed verdict. In *Chappell,* the mother and son alighted in safety and the bus was stopped before reaching town at the mother's re-

quest. In *Shay* a three year old child fell out of a taxi when the door came open. The case was properly submitted under the res ipsa loquitur theory. The defendant complained of an instruction given for plaintiff. The court held the instruction proper and relied on the true principles in these situations:

> "[T]he fact that the minor child is in a custodian's charge does not absolve the carrier from liability, if the carrier's employees know, or should know, that such child will be injured by certain acts of negligence on their part."

■ The principle is that while the carrier owes no special duties and may rely on a presumption of care by the parent, "Where, however, the carrier's employees . . . know, or, in the exercise of reasonable care and diligence, should know, that such child is or will be exposed to danger or injuries by acts or negligence of the carrier's employees, the carrier is not entitled to act upon such presumption and is under [a] duty to use all reasonable and practicable care and diligence to avoid the danger and avert the injury." 13 C.J.S. Carriers § 694, p. 1291 quoted in *Shay*.

■ That is the situation here. The bus driver was not entitled to rely on any presumption but was under a duty to avoid the danger and avert the injury.

The trial court noted that it could not agree with the Temple's argument that the plaintiff, being in the custody of his mother was precluded from recovering. We agree. Additionally, any negligence of the mother, Linda Graeff, cannot, under Missouri law, be imputed to the child. *Schmidt v. Allen*, 303 S.W.2d 652, 658 (Mo.1957); *Reynolds v. Kinyon*, 222 S.W. 476, 479 (Mo.1920); *Rogers v. Toro Manufacturing Company*, 522 S.W.2d 632, 638 (Mo.App.1975).

*Excessiveness of the Verdict*

■ Baptist Temple contends that the jury verdict against it in the amount of $97,100.00 was "clearly" excessive and the action of the trial court in granting the Temple a new trial can be sustained "under the role of uniformity strictly adhered to in Missouri." [26] The trial court, however, did not believe the verdict was excessive and indicated "we would not reverse the decision because of the excessiveness of the verdict." We agree. We rule this point adversely to the respondent Baptist Temple.

■ There is no precise formula for determining whether a verdict is excessive; each case must be considered on its own facts. Consideration is given to the nature and extent of the injuries and the diminished earning capacity, economic conditions, plaintiff's age, and a comparison of the compensation awarded and permitted in cases of comparable injuries. *Ricketts*, 537 S.W.2d at 617; *Walton v. United States Steel Corporation*, 362 S.W.2d 617, 629 (Mo. 1962); *Parlow v. Carson-Union-May-Stern Company*, 310 S.W.2d 877, 885 (Mo.1958). The ultimate test is what fairly and reasonably compensates plaintiff for the injuries sustained.

■ The injuries received by Frankie were serious; Frankie had to undergo five operations, scar tissue developed, the scar tissue was permanent, there is a likelihood of future operations, his life expectancy was lengthy, he cannot engage in several occupations which would be detrimental to his leg; he suffered a 10% disability of the leg. Under all these circumstances we agree with the trial court that the verdict was not excessive. The jury is vested with a broad discretion in fixing the amount of damages. The verdict is comparable to other situations.[27]

**26.** The rule of uniformity is not an exclusive test. The courts have adopted a test which includes uniformity as one of the elements for determination but uniformity is not the sole factor. The rule is a standard of reasonableness of the verdict taking into consideration all of the various factors that the courts have recognized as affecting the issue of reasonableness. *Ricketts*, 537 S.W.2d at 619.

**27.** *Blond v. Overesch*, 527 S.W.2d 663 (Mo. App.1975)—$75,000 to man who suffered severance of tendon and had pain years after not excessive; *Carter v. Consolidated Cabs, Inc.*, 490 S.W.2d 39, 45 (Mo.1973)—$80,000 permanent leg, pelvic and knee injuries; Cf. *Boehmn v. St. Louis Public Service Company*, 368 S.W.2d 361 (Mo.1963); See cases collected in annot., 11 A.L.R.3d 9, 27, 269–271 (1967).

*Other Issues*

The parties have raised certain other issues. The Temple contends that the trial court did not err in granting a new trial because of the cumulative effect of certain matters including the fact that the bus was sometimes referred to as a "school" bus, that Huntsman did not have a chauffeur's license,[28] admission into evidence of colored photographs, the admission of medical containers, etc. The appellant Davis contends that the trial court should have directed a verdict in his favor because no duty was imposed upon him to sound a warning or pass the bus under the circumstances.

We have carefully examined each of these matters and rule them adversely to the respective parties.

*Conclusion*

We are compelled to conclude in this difficult and complex case that the verdict of the jury was correct in all respects and that the trial court erred in granting a new trial on all issues as to all parties. The order of the trial court is therefore reversed and the verdict of the jury is to be reinstated.

The judgment is reversed and the cause remanded with directions to reinstate the verdict and enter judgment thereon.

All concur.

---

**28.** The court gave withdrawal instructions on these matters.